---

### UNITED STATES PAROLE COMMISSION
### WASHINGTON, D.C.

---

### IN RE:  JONATHAN J. POLLARD
### REGISTER # 09185-016

---

### MEMORANDUM OF JONATHAN J. POLLARD IN SUPPORT OF
### COMMISSION'S RECONSIDERATION OF PAROLE CONDITIONS

CURTIS, MALLET- PREVOST,
  COLT & MOSLE LLP
Eliot Lauer
Jacques Semmelman
Gabriel Hertzberg
Sylvi Sareva
101 Park Avenue
New York, New York  10178
Tel.:  (212) 696-6000
Fax:  (212) 697-1559

*Attorneys for Jonathan J. Pollard*

Jonathan J. Pollard respectfully submits this memorandum to the United States Parole Commission ("Commission") in connection with the Commission's reopening of Mr. Pollard's parole hearing pursuant to 28 C.F.R. § 2.28(a).

## PRELIMINARY STATEMENT

Mr. Pollard was released on "mandatory" parole from the custody of the United States Bureau of Prisons to the custody of the Commission and the United States Probation Office for the Southern District of New York (the "Probation Office") on November 20, 2015. Mr. Pollard served exactly 30 years in prison after pleading guilty to one count of conspiracy to commit espionage without intent to harm the United States.  Mr. Pollard had delivered classified information to the State of Israel in 1984 and 1985.

Pursuant to the Commission's Notice of Action dated July 28, 2015, and Notice of Action on Appeal dated October 8, 2015, Mr. Pollard is subjected to three special conditions of parole, in addition to the conditions expressly mandated by 18 U.S.C. § 4209(a).  Specifically, the Commission required Mr. Pollard to submit to (i) 24-hour GPS monitoring of his person (the "GPS Monitoring Condition"); (ii) monitoring of his computer use both at home and at his place of employment (the "Computer Monitoring Condition"); and (iii) a curfew that, as implemented by the Probation Office, requires him to be at home from 7 p.m. to 7 a.m with limited exceptions (collectively, the "Special Conditions").

Mr. Pollard challenged the Special Conditions in an action for a writ of habeas corpus in the United States District Court for the Southern District of New York (the "Habeas Action").  On December 16, 2015, United States District Judge Katherine B. Forrest, presiding in

the Habeas Action, entered an Order remanding the matter to the Commission ("the Remand Order") [Docket No. 26].[1]

The Court identified the "fundamental issue" informing a review of the Special Conditions to be "the question as to whether there is anything that Mr. Pollard can disclose that would endanger the public." (12/14/15 Tr. at 12). The Court observed that it was unclear what the broad restrictions were intended to accomplish "[i]n the absence of factual determination as to some danger based on what Mr. Pollard still knows, if anything, that would be of current use to a foreign government." (*Id.* at 16). Judge Forrest directed the Commission to make findings of fact as to whether there is "secret information in Mr. Pollard's head that they are aware of or have reason to believe exists." (*Id.* at 21).

There is no such "secret information in Mr. Pollard's head." (*Id.*). Mr. Pollard has no valuable intelligence information to impart to anyone. For 30 years, he was a model prisoner. He has been out of prison for more than six weeks and has been a model parolee. The monitoring conditions and curfew serve no legitimate government interest and have no application to the nature of Mr. Pollard's characteristics or offense. More fundamentally, the Special Conditions are simply unnecessary. Mr. Pollard has no incentive to, and no intention of, making a disclosure that would deprive him of his newfound freedom and return him to prison for the rest of his life. There is no reason to subject him to the Special Conditions.

## I.   THE COMMISSION SHOULD STRIKE THE SPECIAL CONDITIONS OF PAROLE BECAUSE MR. POLLARD DOES NOT POSSESS OR REMEMBER ANY VALUABLE INTELLIGENCE INFORMATION

In 1984 and 1985, Mr. Pollard delivered classified documents to the Israeli government. For the past 30 years, he was in federal prison without access to any classified

---

[1] Submitted with this memorandum are Mr. Pollard's submissions in the Habeas Action. Citations herein to "Docket No. __" refer to the docket numbers in the Habeas Action.

information.  During his 23 years as part of the general prison population, Mr. Pollard never

revealed any secrets to anyone.  In granting Mr. Pollard's application for mandatory parole, the

Commission acknowledged that there was no reasonable probability of recidivism.  The reality is

that there is not even a reasonable *possibility* that Mr. Pollard will commit another crime.

A series of unlikely assumptions are required in order to arrive at the conclusion

that Mr. Pollard continues to pose a threat to national security.  First, even if some of the

information is still technically "classified" by statute, as a practical matter, given the nature of

the information disseminated and the statements of knowledgeable insiders, there is a high

probability that even classified information from 30 years ago is of no particular value today.

Rather, such information is likely stale and useless, as explained by former U.S. National

Security Advisor Robert C. McFarlane in a Declaration dated June 4, 2015 that is in the

Commission's file:

> I see no reason for concern that Mr. Pollard might still deliver
> classified information to someone.  To the extent Mr. Pollard even
> recalls any classified information, it would date back 30 years or
> more, and would have no value to anyone today.  From the point of
> view of intelligence, as in so many other respects, today's world
> bears almost no resemblance to the world of 30 years ago.
> ***Classified information from 30 years ago is useless***.

*Id*. at ¶ 12 (emph. supplied) (Declaration of E. Lauer, Ex. 3 [Docket No. 3]).  Likewise, in a

Declaration dated June 9, 2015, Senator Dennis DeConcini affirmed his belief that "the

information would not be of value to anyone today."  Thus, not only does Mr. Pollard have no

motive to disclose 30-year old information, the information itself, even if technically

"classified," likely poses no real risk to national security.

In any event, the potential risk at issue is not the dissemination of physical

materials, since Mr. Pollard does not have any classified documents in his possession.  Rather,

the only information Mr. Pollard could possibly disclose is anything he might have retained in his head from over 30 years ago.  And there is no indication that Mr. Pollard ever studied in detail the voluminous documents he delivered, or that he remembers their contents to this day. Mr. Pollard's unlawful activity involved identifying large piles of hard copy documents such as intelligence publications and satellite photographs by topic, physically removing them from a government agency building in a suitcase, handing the suitcase to an Israeli government representative for photocopying, and later returning the suitcase to the government building.  *See* Indictment at ¶¶ 19-21, *United States v. Pollard*, No. 86 Cr. 0207 (D.D.C. June 4, 1986) (Lauer Decl. Ex. 1 [Docket No. 3]).  This activity occurred approximately three times a week.  *Id.* at ¶ 20.  Thus, over the course of two years, Mr. Pollard may have selected and delivered thousands of complex and lengthy documents.  It is inconceivable that anyone could memorize the details of such documents at the time of disclosure, let alone thirty years later.

It is possible that a number of the documents have not been officially declassified. However, it is implausible to suggest that Mr. Pollard has been able to preserve any meaningful details from the thousands of documents he reviewed only cursorily 30 years ago.  Even if he still remembers some general ideas from the documents, such information has no value without the actual images, numbers, or texts themselves.  Thus, even assuming the materials themselves are "classified," there is no suggestion that Mr. Pollard remembers, or could possibly remember, the classified information to an extent that it could be of any value to anyone.

Moreover, Mr. Pollard has no motive to disclose any vague, stale concepts he might recall from 30 years ago.  By contrast, he has a clear incentive to remain on his best behavior, as he has for the past six weeks under parole supervision, and for the 30 years prior in federal prison.  The notion that, having just been released, he would risk his freedom (most likely

- 4 -

for the rest of his life) makes no sense.  Indeed, the DOJ never expressed any such concern during the course of the mandatory parole proceedings.  On July 1, 2015 (a few days before Mr. Pollard's mandatory parole hearing), Assistant U.S. Attorney Jay I. Bratt, Deputy Chief, National Security Section of the U.S. Attorney's Office in Washington D.C., following consultation with Intelligence and Defense Agencies, concluded that there was no concern that Mr. Pollard would disseminate classified information upon release.  Mr. Bratt wrote:  "the government does not intend to advocate to the U.S. Parole Commission that, for the purposes of applying 18 U.S.C. § 4206(d), there is a reasonable probability that Mr. Pollard will commit a Federal, state, or local crime if released on parole."  (Lauer Decl. Ex. 3 [Docket No. 3]).  Mr. Pollard has nothing to gain, and everything to lose, from disclosing dated 30-year old information.

None of these truths is diminished by a letter written almost 21 years ago by William O. Studeman, then Acting Director of the CIA (the "Studeman Letter"), who advocated against the early release of Mr. Pollard in 1995, even though Mr. Pollard had not yet sought parole at that time.  Nothing in the dated Studeman Letter provides any rational basis for the Special Conditions.  Back in 1995, Mr. Studeman alleged that Mr. Pollard had an "excellent memory" and possessed information "in his mind" that he might potentially release to Israel. Setting aside whether Mr. Studeman truly had any factual basis for his assertions concerning Mr. Pollard's memory in 1995, in the absence of any authoritative, *current* statement that any such information is of any value today, or that Mr. Pollard reasonably could be viewed to have retained specific concrete details regarding his activities in 1984 and 1985, the Studeman Letter represents an ancient piece of history that has no bearing on the present proceeding.

The Studeman Letter also creates an inaccurate picture when it alleges that during Mr. Pollard's incarceration, he "released, or attempted to release, classified information in

letters." (*Id.* at 4).  Mr. Studeman is apparently referring to the years Mr. Pollard spent in

isolation and solitary confinement or its equivalent, during which all of Mr. Pollard's written

communications were submitted to government censors for review and redaction of any

confidential or sensitive information.  Thus, it is not surprising that Mr. Pollard was never

charged with delivering or attempting to deliver confidential information at any time in his 30-

year stay within the federal  correctional system.  Moreover, the unfair assertion that Pollard

"slipped a letter to his father," which was later published in a "national newspaper," is a gross

overstatement.  Every letter Mr. Pollard sent from prison went through Navy intelligence

screening, including the letter that was delivered through his father to the Wall Street Journal,

and later prominently published by the Wall Street Journal.  (*See* Tab A, attached).  The letter

does not contain anything that could be fairly characterized as classified or confidential

information in any respect, and at no time did anyone from the government or Bureau of Prisons

criticize Mr. Pollard in any manner with respect to the publication of that letter.  Accordingly,

nothing in the Studeman Letter reflects negatively on Mr. Pollard's conduct - indeed, he was a

model prisoner.[2]

Turning away from the 21-year old letter and focusing on the present, the truth

remains that Mr. Pollard does not possess in his head any sensitive information.  Mr. Pollard is

no different from any other white-collar, non-violent parolee.  He should be required to report to

his parole officer in person, check in by phone as required, and be subjected to spot checks and

home visits as appropriate.  As discussed below, no additional restraints on Mr. Pollard's liberty

are necessary or justified.

---

[2]  Consideration of the antiquated Studeman letter would be directly inconsistent with Judge Forrest's instruction that on remand, any justification based on the level of Mr. Pollard's criminality "at a much earlier point in time" be "brought forward to justify and support the very severe broad restrictions" at issue. (12/14/15 Tr. at 14).  As the court noted, that behavior "is as to a past fact, and it is unclear how [it] relates to protection of the public welfare or any other sentencing factor currently." (*Id.* at 16-17).

## II.   THE CONDITIONS ARE COMPLETELY ARBITRARY BECAUSE THEY DO NOT ADDRESS ANY LEGITIMATE OBJECTIVE

Although the Commission has a certain amount of discretion to impose special conditions on parole, that discretion is not unlimited.  Section 4209 authorizes the Commission to impose additional conditions of parole "to the extent that such conditions are reasonably related to (1) the nature and circumstances of the offense; and (2) the history and characteristics of the parolee; and [it] may provide for such supervision and other limitations as are reasonable to protect the public welfare."  18 U.S.C. § 4209(a).

Federal regulations provide additional constraints.  They provide that the Commission may impose special conditions of release only if it determines that "imposing the condition is reasonably related to the nature and circumstances of [the parolee's] offense or . . . history and characteristics, and at least one of the following purposes of criminal sentencing: The need to deter [the parolee] from criminal conduct; protection of the public from further crimes; or the need to provide [the parolee] with training or correctional treatment or medical care."  28 C.F.R. § 2.40(b) (emphasis added).   In choosing a condition to add to those mandated by statute, the Commission is required to consider "whether the condition involves no greater deprivation of liberty than is reasonably necessary for the purposes of deterrence of criminal conduct, protection of the public from crime and offender rehabilitation."  *Id.*

The parole conditions previously imposed upon Mr. Pollard are not reasonably related (1) to the nature and circumstances of the offense or the history and characteristics of Mr. Pollard; or (2) to any of the three purposes of criminal sentencing specified in the regulation. The conditions would not have prevented Mr. Pollard from committing his underlying offense, nor would they have aided law enforcement officials in detecting his criminal activity.  They would similarly have no impact on Mr. Pollard's ability to disclose any information he might

- 7 -

retain today, even though he has no such information and has no intention of jeopardizing his

freedom.  The conditions are completely arbitrary, and serve no legitimate governmental

function or need.

### A.      The GPS Monitoring Condition

The GPS Monitoring Condition requires Mr. Pollard to wear a GPS monitor

strapped to his wrist 24 hours a day.  To avoid the device discharging (which would constitute a

violation of his supervision), Mr. Pollard has to connect the device to an electrical current for

hours each day, even on the Sabbath, which forces him to violate a basic tenet of his faith

(Orthodox Judaism).  (*See* Declaration of Rabbi P. Lerner ¶ 9 [Docket No. 6]).  Mr. Pollard's

probation officer has represented to us that he has supervised thousands of parolees, and this is

only his third case of GPS monitoring.  (Declaration of J. Semmelman ¶ 5 [Docket No. 9]).

While in rare cases, GPS tracking can meet statutory, regulatory, and

constitutional requirements, this is not such a case.  For example, courts have allowed GPS

tracking of convicted sex offenders to ensure deterrence as well as protection of the public.  In

*United States v. Porter*, 555 F. Supp. 2d 341 (S.D.N.Y. 2008), the releasee was a convicted sex

offender who had violated multiple restrictions of his release, including failing to account for his

whereabouts.  *Id.* at 344.  This was of particular concern because the offender was prohibited

from unsupervised contact with minors.  *Id.*  As a result of his violations, the court imposed a

special condition requiring his movements to be monitored through a GPS device for the entire

term of his supervised released.  The court found that "the GPS condition [was] reasonably

related to his crimes and [did] not represent a greater deprivation of liberty than . . . reasonably

necessary."  *Id.*

Likewise, in other cases that involve parolees or releasees with a proven history of

violating conditions of parole, or of posing a threat to others, the GPS tracking condition has

been upheld as a reasonable means of verifying compliance and protecting the public.  *See, e.g.*, *United States v. Bonds*, No. 14-50487, 2015 U.S. App. LEXIS 10909, at *2 (9th Cir. June 26, 2015) ("In light of Bonds's criminal history and his repeated failures to comply with the terms of his supervision, the district court did not abuse its discretion by imposing the condition to facilitate his compliance with the other conditions of supervised release.") (emphasis added); *see also United States v. Miller*, 530 Fed. Appx. 335, 337-338 (5th Cir. 2013) ("Miller has *a history of stalking*, escape, angry outbursts, and erratic behavior . . . .  In light of Miller's background, any impairments of Miller's privacy due to the GPS monitoring are outweighed by the condition's benefits. These include effective verification of compliance with the other conditions of supervised release, deterrence of future crimes, and protection of the public.") (emphasis added).

By contrast, Mr. Pollard was a model prisoner and has been a model parolee since his release.  There is thus no post-release history that justifies the GPS tracking requirement. Moreover, the monitoring of Mr. Pollard's location would neither protect the public nor deter Mr. Pollard from further criminal conduct.  Although a GPS tracking device would allow the Probation Office to watch a blip of Mr. Pollard's location move around the Southern District of New York, it does nothing to physically prevent or deter him from having a conversation at a coffee shop, within the confines of his apartment or in a public park.  As noted above, GPS tracking can be useful where the offender's ability to commit a crime depends in some part on his location (e.g., stalking).  Here, there simply is no relationship between the underlying offense and the need to monitor Mr. Pollard's whereabouts, where the Commission's supposed concern is a conversation that could theoretically occur anywhere.

Nor is there any realistic concern that Mr. Pollard would foolishly violate the conditions of his parole and attempt to leave the United States, either for Israel or anywhere else.[3]  As much as Mr. Pollard would like to be in Israel, he fully recognizes that he would immediately find himself re-incarcerated if he attempted to board an airplane.  There is absolutely no reason to believe that Mr. Pollard would deliberately attempt to violate the conditions of his parole in such an obvious manner, and thus automatically risk being sent back to prison for the remainder of his life.  Accordingly, the mere fact that Mr. Pollard would *like* to live in Israel does not in any way equate to a pathological, uncontrolled propensity to attempt to fly there despite the devastating consequences.  Mr. Pollard fully understands the restrictions that prevent him from approaching airports, consulates, and embassies, and has every intention of abiding by such restrictions.

The fact remains that Mr. Pollard simply *cannot* fly to Israel, or anywhere else, nor does he have any intention to do so without U.S. government approval.  Presumably, he would not be permitted access to a domestic or international flight, nor does he have a U.S. (or any other national) passport.  Moreover, GPS monitoring is an unnecessarily burdensome means of preventing Mr. Pollard from leaving the country, and thus runs afoul of Judge Forrest's instruction to the Commission to "pay particular attention to 28 C.F.R Section 2.40 and the language therein," which requires the Commission to use the least restrictive means of achieving its alleged objectives.  (12/14/15 Tr. at 18).

---

[3] The Commission provided us with a copy of a November 13, 2015 letter from Congressmen Nadler and Engel, who requested that the Justice Department grant Mr. Pollard permission to travel to Israel.  Unquestionably, Mr. Pollard certainly wishes to live in Israel – but only with the full consent of the U.S. government.  Nothing in the Congressmen's letter indicates to the contrary.

In sum, Mr. Pollard's case is no different from any other parolee with respect to geographic restrictions, and there is thus no reason to single him out by imposition of the highly onerous and humiliating GPS Condition.

### B.   Curfew

Mr. Pollard has also been subjected to a curfew that confines him to his studio apartment from 7 p.m. to 7 a.m. most days (he is permitted to stay out on the Sabbath until 11 p.m.).  For no purpose, the curfew prohibits him from leading a full professional and social life, which are critical to his rehabilitation and successful reintegration to society.  While Mr. Pollard has not started working yet (because of the Computer Monitoring Condition, as explained below), the curfew prevents him from working after business hours or attending business dinners.  Mr. Pollard is not and has never been a nocturnal criminal — confining him to his home at night is just an arbitrary restriction on his ability to reintegrate into society.

Courts have upheld the imposition of a curfew only where justified by the nature of the parolee's offense or history of parole violations.  *Compare, e.g., United States v. Whitfield*, 464 Fed. Appx. 525, 529 (6th Cir. 2012) (upholding curfew where parolee had extensive criminal history, and the fact that the underlying conviction occurred at night contributed to its "overall nature"); *with United States v. Neeley*, 675 F. Supp. 2d 655, 658, (W.D. Va. 2009) ("[T]he suggested curfew is unreasonable in light of Neeley's background and his aim of finding employment as a construction worker, which could require reporting to job sites early in the morning"); *United States v. Torres*, 566 F. Supp. 2d 591, 602 (W.D. Tex. 2008) (finding that where defendant had registered and re-registered in a timely fashion with the Texas authorities every ninety days as required by law since his release from prison, the imposition of a curfew would violate his right to be free from excessive bail under the Eighth Amendment).

Mr. Pollard's offense cannot be compared to a drug deal or an act of violence, where the nocturnal nature of the crime might justify keeping the offender off the streets at night, to safeguard against repeat conduct, and to ensure public safety. Nothing in Mr. Pollard's "history or characteristics" justifies the imposition of a curfew. Similarly, subjecting Mr. Pollard to an arbitrary curfew does not serve any legitimate governmental sentencing interest, since Mr. Pollard's ability to disclose supposedly confidential information could occur at any time of day. There is therefore no statutory or constitutional basis for its imposition.

### C. Computer Monitoring

Finally, the Computer Monitoring Condition constitutes a "restriction" on Mr. Pollard's computer and internet use. *See United States v. Lifshitz*, 369 F.3d 173, 188-189 (2d Cir. 2004) ("monitoring" of behavior constitutes a "restriction" on behavior). Courts have upheld broad internet and computer restrictions only where "(1) the defendant used the internet in the underlying offense; (2) the defendant had a history of improperly using the internet to engage in illegal conduct; or (3) particular and identifiable characteristics of the defendant suggested that such a restriction was warranted." *United States v. Perazza-Mercado*, 553 F.3d 65, 70 (1st Cir. 2009). None of these circumstances are present here.

Computer- and internet-related conditions are most common where the defendant used the internet to perpetrate the crime (most commonly, in pedophilia cases), or where less restrictive conditions would be ineffective. *Compare, e.g., United States v. Johnson*, 446 F.3d 272, 281 (2d Cir. 2006) (upholding internet ban because Johnson had made "outbound use of the Internet to initiate and facilitate victimization of children"); *with United States v. Peterson*, 248 F.3d 79, 82-84 (2d Cir. 2001) (vacating a computer and Internet ban, in part because "there [was] no indication that Peterson's past incest offense had any connection to computers or to the Internet.").

Here, there is no connection between the underlying offense and computers or the internet, and Mr. Pollard does not have a history of using computers to engage in illegal conduct. To the contrary, when Mr. Pollard committed the underlying offense in 1984-1985, there was no internet, and personal computing was still in its early stage.  Mr. Pollard has no documents – electronic or otherwise – that he can possibly transmit to anyone.  Mr. Pollard's unlawful activity involved removing *hard copy documents* from a government agency building.  The Computer Monitoring Condition bears no relation to such actions.  Moreover, the monitoring of Mr. Pollard's computer use does not serve to protect the public, since it would not prevent him from disclosing information in person, over the phone, or via regular mail.

Critically, the requirement that Mr. Pollard's work computer be monitored necessarily renders him unemployable.  Mr. Pollard is a highly intelligent graduate of Stanford University and has an offer of employment from a real estate investment firm in New York City. But no reasonable employer would hire Mr. Pollard if it meant that the employer's computer system was subject to unrestrained monitoring by the United States government.  The Computer Monitoring Condition functions as an absolute bar against Mr. Pollard's ability to begin a professional life after prison.

Courts have vacated computer-related conditions where the breadth of the condition impermissibly affected the releasee's employment prospects, and therefore conflicted with the rehabilitative goals of supervised release.  *See United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010) (computer restriction that prevented offender "from continuing in a field in which he ha[d] decades of accumulated academic and professional experience" "affirmatively and aggressively interfere[d] with the goal of rehabilitation"); *United States v. Holm*, 326 F.3d 872, 878 (7th Cir. 2003) ("Because Holm is most likely to find gainful employment in the

computer field upon his release, the conditions as currently written could affect his future productivity and jeopardize his rehabilitation in violation of the command of § 3583(d).");
*United States v. Johnson*, Nos. 97-CR-0206, 98-CR-160, 2005 U.S. Dist. LEXIS 52, at *31-32 (N.D.N.Y Jan. 5, 2005) ("The Court has concern regarding the effects of prohibiting Internet access on Defendant's employment. Defendant is an educated individual who, before his conviction, enjoyed success in a technical career. Since being released from prison, Defendant has suffered a significant setback in his employment opportunities, performing maintenance work. . . . [P]rofessional advancement is an important part of Defendant's resuming a positive lifestyle.").   Because the Computer Monitoring Condition would have the effect of preventing Mr. Pollard from obtaining and maintaining gainful employment, it is plainly inconsistent with the goals of criminal sentencing.

In its Notice of Action on Appeal, the Commission suggested that the Computer Monitoring Condition would assist the Probation Office in ensuring that Mr. Pollard complies with his obligations under the 1986 plea agreement, which requires Mr. Pollard to refrain from disclosing any classified information he might still recall, and to submit any book manuscript or article to the Director of Naval Intelligence for pre-publication approval.  In reality, the Computer Monitoring Condition does nothing to ensure Mr. Pollard's compliance with these requirements.  In a purely hypothetical sense, Mr. Pollard could deliver a handwritten hard-copy manuscript and would have no need to use a computer or the internet to create or transmit the offending manuscript.  Thus, computer and internet monitoring cannot in any way be justified on the theoretical notion that a manuscript could be transmitted electronically.  Moreover, any violation of the plea agreement would become known very quickly, and would immediately result in Mr. Pollard's remand to prison.  Having just been released on parole after spending 30

years in prison, it is inconceivable that Mr. Pollard would risk returning to prison in order to publish an unauthorized book or article. In sum, the Computer Monitoring Condition is neither connected to the underlying offense nor necessary to protect the public, and therefore should not be imposed.

## CONCLUSION

Mr. Pollard has served his time. He has no valuable information to impart to anyone. He is not a threat or a danger. He has no motive, inclination, or incentive to violate the law. There is no chance of recidivism. Mr. Pollard has an opportunity to work and contribute to society. He is a candidate for the least intrusive conditions. For these reasons, the Commission should amend Mr. Pollard's parole conditions to remove the GPS Monitoring Condition, the curfew and the Computer Monitoring Condition.

Dated: New York, New York
     January 15, 2016

CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP

By:    *Eliot Lauer* /GH
_____

Eliot Lauer
Jacques Semmelman
Gabriel Hertzberg
Sylvi Sareva
101 Park Avenue
New York, NY 10178
Tel.: (212) 696-6000
Fax: (212) 697-1559

*Attorneys for Petitioner Jonathan J. Pollard*

24293182

- 15 -

TAB A

## *Appeasement of* Iraq *Made Me a Spy*

The Wall Street Journal

February 15, 1991 Friday

Copyright 1991 Factiva, a Dow Jones and Reuters Company
All Rights Reserved



Copyright © 1991, Dow Jones & Co., Inc.)

**THE WALL STREET JOURNAL.**
U.S. EDITION

**Section:** Pg. A12

**Length:** 1616 words

## Body

In 1985, my son Jonathan Pollard pleaded guilty to providing Israel with information about the military capabilities of Arab states, including Iraq. Today he sits in a basement cell, in isolation 23 hours a day, serving a life sentence.

Jonathan was never accused of or indicted for treason, because he did not commit treason. He was indicted on one count -- giving information to an ally, Israel. Abdel Kader Helmy, an Egyptian-American rocket scientist, participated in a scheme to illegally ship ballistic missile technology to Egypt -- technology later used to help increase the range of Iraq's Scud-B missiles. Mr. Helmy got less than a four-year sentence. Jonathan, who warned Israel about Iraq's capabilities, got life.

America is now fighting a war with Iraq, while the one person who tried to warn Israel about Iraqi threats sits in jail. In a 1989 letter excerpted below, Jonathan wrote to an American rabbi from his cell that America would have to go to war against Iraq if we failed to prevent the completion of chemical facilities that we knew were under construction. How right he was.

-- Morris Pollard

---

Dear Rabbi,

My name is Jonathan Pollard and I am currently serving a life sentence due to my activities on behalf of Israel.

Lest you labor under a false impression, Rabbi, I want to state quite categorically that I do not consider myself to be above the law. I fully appreciate the fact that I must be punished for my activities, however justified I may have felt them to be. That being said, I do not believe that the draconian sentence meted out to me was in any way commensurate with the crime which I committed. Nowhere in my indictment . . . was I ever described as a "traitor," which is hardly a surprise given the fact that the operation with which I was associated actually served to strengthen America's long-term security interests in the Middle East.

Notwithstanding {then Defense Secretary Caspar} Weinberger's disingenous opinion, any objective examination of the record will show that no American agent, facility or program was compromised as a result of my actions -- not one. But this salient fact was coveniently overlooked by Mr. Weinberger, who felt that I deserved the death penalty for having had the audacity to make Israel "too strong."

In retrospect, perhaps one of the worst things the Reagan administration did to Israel during the course of our trial was that it purposely distorted the nature of my activities in such a way so as to leave the impression that Israel had somehow

Appeasement of Iraq Made Me a Spy

become a threat to the national security of this country. So by intent the subsequent sentence I received was an arrow aimed directly at the heart of the U.S-Israel "special relationship."

The case of Mr. and Mrs. Abdel Kader Helmy appears to be yet another instance where the political aspects of an espionage trial have been of paramount concern to the government. As you'll recall, the Helmys are the Egyptian-born U.S. citizens who were accused last year of funneling highly sensitive ballistic missile technology to their native land. At the time of his arrest on June 24, 1988, {Mr.} Helmy was a senior propulsion engineer who held a "secret" level security clearance from the U.S. Department of Defense. According to a 36-page affidavit filed by the Customs Service. . . . U.S. customs agents searching {Mr.} Helmy's trash found handwritten notes outlining how to work with carbon -- carbon fiber material, used in rocket nose cones and "stealth" aircraft . . .; instructions on building rocket exhaust nozzles; a description of an extremely sensitive microwave telemetry antenna; and a complete package needed to build or upgrade a tactical missile system.

Although there is no public evidence linking {Mr.} Helmy directly with the Iraqis, intelligence sources have indicated that the Egyptians used {Mr.} Helmy's expertise to help Baghdad modify its stockpile of Soviet-supplied Scud-B ballistic rockets. His principal responsibility, however, was to ensure the success of an Egyptian-Iraqi missile program which had encountered some developmental problems. Code named BADR 2000 by the Egyptians and SAAD-16 by the Iraqis, this Argentine-designed weapon has an estimated range of 500-1,000 miles, and, from what I've been told, figures prominently in Arab strategic planning against Israel.

If one compares the way in which the government responded to my affair with that of its soft-pedalling of the Helmy case, the existence of a double standard becomes apparent. Firstly, at the insistence of the State and Defense departments, all espionage-related charges against Mr. and Mrs. Helmy have been quietly dropped. . . . {T}he administration has done everything it can to reduce the notoriety of the Helmy affair.

The problem . . . lay in the fact that many of the photos I turned over to the Israelis were of a number of Iraqi chemical weapons manufacturing plants which the Reagan administration did not want to admit existed. Why? Well, if no one knew about these facilities then the State and Defense Departments would have been spared the embarrassing task of confronting Iraq over its violation of the Geneva Protocol of 1925, which banned the use of chemical weapons in war. You have to remember . . . that at the time of my sentencing the massacre of Kurdish civilians in Halabja had not yet occurred, and what little public concern was being voiced over Iraq's apparent use of poison gas was largely ignored by the administration, which did not want to anger the Arab world by criticizing the employment of such barbaric weapons against Iran. The photos I gave Israel, though, if "compromised," would have jeopardized the administration's policy of callous indifference towards this issue, in that they constituted hard, irrefutable proof that Iraq was indeed engaged in the production and wide-scale use of chemical weapons. What the administration was really concerned about was being placed in a position where it would have to admit that it had tacitly condoned the creation of an Iraqi chemical weapons manufacturing capability.

Once the atrocity at Halabja had occurred, though, the White House was placed in a rather awkward position. On the one hand, the U.S. intelligence community did not want to be accused of having failed to keep an eye on Iraq's burgeoning chemical weapons arsenal. Then again, the CIA . . . could not very well confirm the existence of the Iraqi poison gas plants without running the risk of compromising the Reagan administration's policy towards these facilities.

After a few days of "soul searching," the State Department finally admitted that the U.S. had intercepted some Iraqi military communications which indicated that lethal gas had, in fact, been employed against unarmed Kurdish civilians. The Iranians had astutely outmaneuvered them, though, and the issue had to be "contained" before it caused a rift in U.S.-Arab relations. Certainly, confirming the undeniable operational employment of chemical munitions by the Iraqis was far preferable to describing the exact dimension of their poison gas plants, which would have raised some uncomfortable questions on Capitol Hill . . .

Thus, in an attempt to recapture the moral "high ground," so to speak, from Iran, the White House evidently decided that it would be better for the U.S. to be seen as leading the public denunciation of Iraq rather than the Ayatollah Khomeini.

Appeasement of Iraq Made Me a Spy

As it was, though, the administration still managed to salvage its standing in the Arab world by preventing Congress from imposing any punitive sanctions against Iraq. In essence, then, what I did by passing satellite photos of the Iraqi poison gas plants to Israel was endanger the Reagan administration's pro-Saudi political agenda, not the intelligence community's "sources and methods."

According to the prosecution, there were two reasons why the government refused to tell Israel about Iraq's poison gas plants: 1) fear of compromising the KH-11 {intelligence} system, and 2) concern over the Israelis' probable reaction once they recognized the threat these facilities posed to their survival.

What the Israelis would actually have considered was a preventive attack on the Iraqi chemical-arms factories before they had become fully operational. Once they had come on-line, you see, and the Iraqis had been able to disperse their arsenal of chemical munitions, these plants, like the ones in Syria, would only have been attacked either in war time, where the idea of a pre-emptive strike is valid, or in a clandestine sabotage campaign aimed at slowing their production of poisons. This was the same reasoning, by the way, that lay behind the Reagan administration's desire to bomb the Rabta industrial complex before the Libyans had had the opportunity to complete its construction.

The crisis over the Rabta plant does beg the question, though: If the Reagan administration felt justified in its desire to eliminate what it perceived to be an impending Libyan chemical threat to our national security, why was it so unwilling to grant Israel the same right of preventive self-defense with regard to Iraq's poison gas manufacturing facilities?

So what was I supposed to do? Let Israel fend for herself? If you think that is what I should have done, then how can we condemn all those . . . who during the Second World War consciously participated in the abandonment of European Jewry? Seriously, Rabbi, what would be the difference between what they did and a decision on my part to have kept silent about the Iraqi poison gas threat to Israel? I'd rather be rotting in prison than sitting shiva for the hundreds of thousands of Israelis who could have died because of my cowardice.

Jonathan Pollard

## Notes

PUBLISHER: Dow Jones & Company

## Classification

**Language:** ENGLISH

**Publication-Type:** Newspaper

**Journal Code:** J

**Subject:** JAIL SENTENCING (91%); MISSILE SYSTEMS (90%); GUILTY PLEAS (90%); TREASON (90%); SENTENCING (90%); ESPIONAGE (90%); INDICTMENTS (89%); IRAQ WAR (78%); NATIONAL SECURITY (78%); DEFENSE DEPARTMENTS (73%)

**Industry:** I25 Chemicals; I364 Aerospace Products/Parts; IAER Aerospace/Defense

**Geographic:** UNITED STATES (95%); ISRAEL (95%); IRAQ (94%); EGYPT (93%); MIDDLE EAST (79%)

DJI Codes: CHM, ARO, STD, DEF, ML
DJI Descriptors: Chemicals, Aerospace, State Department, Defense Department, Middle East

Appeasement of Iraq Made Me a Spy

**Load-Date:** December 6, 2004