UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

JONATHAN J. POLLARD,

                          Petitioner,

           -v-

UNITED STATES PAROLE COMMISSION; J.
PATRICIA WILSON SMOOT, solely in her
capacity as Chair of the United States Parole
Commission; UNITED STATES PROBATION
OFFICE FOR THE SOUTHERN DISTRICT OF
NEW YORK; MICHAEL J. FITZPATRICK,
solely in his capacity as Chief U.S. Probation
Officer,

                        Respondents.

------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: June 6, 2016

15-cv-9131 (KBF)

MEMORANDUM
OPINION & ORDER

KATHERINE B. FORREST, District Judge:

       In this action, petitioner Jonathan J. Pollard challenges certain special

conditions imposed by respondent United States Parole Commission and

implemented by respondent United States Probation Office for the Southern

District of New York.  (ECF Nos. 1 & 36.)  This memorandum opinion & order

addresses the proper role in this proceeding of evidence submitted by respondents

ex parte for in camera review.

I.      LITIGATION HISTORY

       In 1984 and 1985, Pollard, then an Intelligence Research Specialist with the

United States Navy, delivered classified information to the State of Israel.  (ECF

No. 1 at ¶ 1.)  On June 4, 1986, pursuant to a written plea agreement, he pled guilty

to one count of conspiracy to deliver national defense information to a foreign government, in violation of 18 U.S.C. § 794(c).  (Id. at ¶ 21; ECF No. 3, Exh. B.)  On March 4, 1987, he was sentenced to life in prison.  (ECF No. 1 at ¶ 22.)

Under the parole statutes in place at the time Pollard pled guilty, he was entitled to be released on parole after serving thirty years unless the Parole Commission "determine[d] that he ha[d] seriously or frequently violated institution rules and regulations or that there [wa]s a reasonable probability that he w[ould] commit any Federal, State, or local crime."  18 U.S.C. § 4206(d) (1985).  The Commission did not make such a determination, and on July 28, 2015 granted Pollard his parole, with a scheduled release date of November 20, 2015.  (ECF No. 1 at ¶ 30; ECF No. 3, Exh. F.)

In the Notice of Action granting parole, the Commission also imposed conditions of release pursuant to its authority under 18 U.S.C. § 4209(a).  That statute requires the Commission to impose certain conditions and authorizes it to "impose or modify other conditions of parole to the extent that such conditions are reasonably related to (1) the nature and circumstances of the offense; and (2) the history and characteristics of the parolee."  The same statute further authorizes the Commission to "provide for such supervision and other limitations as are reasonable to protect the public welfare."  Federal regulations require that special conditions of release be "reasonably related to the nature and circumstances of [the parolee's] offense or [the parolee's] history and characteristics, and at least one of" three

2

purposes: the need for individual deterrence; protecting the public from further crimes; or the parolee's need for training, treatment, or care.  28 C.F.R. § 2.40(b).

The Parole Commission's one-page Notice of Action imposed several special conditions of release, two[1] of which are at issue in this proceeding.  First, the Commission ordered that Pollard would be "subject to the Global Positioning Systems monitoring inclusive of a curfew and/or exclusion zones as determined by [his] U.S. Probation Officer."  (ECF No. 3, Exh. F.)  Second, the Commission ordered that Pollard

> (1) consent to [his] probation officer and or probation service representative conducting periodic unannounced examinations of [his] computer(s) equipment which may include retrieval and copying of all memory from [his] computer(s) and any internal or external peripherals to ensure compliance with this condition and/or removal of such equipment for the purpose of conducting a more thorough inspection; and (2) consent at the direction of [his] probation officer to having installed on [his] computer(s), at [his] expense, any hardware or software systems to monitor [his] computer use.  (Id.)

Pollard appealed the imposition of these requirements to the Parole Commission's National Appeals Board.  (ECF No. 1 at ¶ 36.)  The Board affirmed both of these conditions in a single-page decision.  (ECF No. 3, Exh. G.)  In so doing, the Board clarified that the computer monitoring condition applied "regardless of whether it is a personal communication device, home computer, or a computer you use for employment because, as a practical matter, the boundaries between personal and business computer use are blurred."  (Id.)

---

[1] In addition to the two special conditions discussed, the Parole Commission originally prohibited Pollard from using any computer with access to the internet without the Commission's prior written approval.  (ECF No. 3, Exh. F.) Pollard appealed this condition, as well as the two discussed, to the National Appeals Board, and that body ordered this condition removed.  (Id., Exh. G.)

3

Upon Pollard's release, he was required to visit the Probation Office for the Southern District.  (ECF No. 8 at ¶ 3.)  He signed an agreement requiring him to, among other things, respond promptly to his probation officer's calls and visits and obey, with limited exceptions, a 7:00 p.m. to 7:00 a.m. curfew.  (Id. at ¶¶ 4 & 7.)

On November 20, 2015, the day Pollard was released from prison, he filed the original petition in this matter, seeking an order that respondents eliminate the GPS monitoring and computer monitoring conditions.  (ECF No. 1.)  The parties briefed the matter on an expedited basis, and the Court heard oral argument on December 14, 2015.  (ECF No. 27.)

Ruling orally from the bench, the Court expressed its view that "the record of the Parole Commission's reasons … is insufficient to support the nature and the breadth of the restrictions."  (Id. at 12.)  The Court therefore remanded the matter to the Commission to provide it with "an opportunity … to more fully set forth its rationale."  (Id.)  The Court also identified what it took to be a fundamental question: "whether there is anything that Mr. Pollard can disclose that would endanger the public;" in other words, "is there any confidential government information left to disclose?"  (Id.)  The Court left the contested conditions in place during the remand.  (Id. at 17.)

On remand, the Parole Commission received memoranda setting out Pollard's position.  (ECF No. 38, Exhs. C & E.)  The Commission also received, among other things, a letter from Director of National Intelligence James R. Clapper.  (Id., Exh. D.)  Clapper's letter explained, among other things, that the United States

4

Intelligence Community had "confirmed that certain information compromised by Mr. Pollard remains currently and properly classified at the Top Secret and Secret levels." (Id.)

On March 2, 2016, the Parole Commission published a four-page, single-spaced Notice of Action relating to Pollard's conditions.  (Id., Exh. G.)  The Commission upheld both the GPS monitoring and computer monitoring conditions and provided additional reasoning not present in its original July 2015 Notice of Action. The Commission noted that Pollard "compromised information that remains classified at the Top Secret and Secret levels and future unauthorized disclosure of the information could risk harm to the national security of the United States."  (Id. at 2.)

On April 8, 2016, Pollard moved to re-open the case and renew his petition. (ECF No. 36.)  The Court re-opened the case and set a briefing schedule.  (ECF Nos. 40 & 41.)  As part of that order, the Court noted that "respondents may deem it appropriate to address whether information at issue remains 'Secret' or 'Top Secret.'"  (ECF No. 40 at 1.)  The Court therefore directed the parties to "confer as to whether (1) the Court can or should resolve such factual disputes; (2) the standard that would apply; and (3) whether respondents should/must support their position on this motion with reference – in camera – to specific examples of 'Secret' or 'Top Secret' information deemed to be at risk."  (Id. at 1-2.)

On May 6, 2016, respondents moved for an extension of time to oppose Pollard's renewed petition.  (ECF No. 44.)  The letter also expressed an "intention to

support [respondents'] response to the renewed Petition with a classified submission for the Court's <u>ex parte</u> and <u>in camera</u> review." (<u>Id.</u> at 1.)  Pollard filed a letter on May 9 objecting to the proposed use of <u>ex parte</u> submissions.  (ECF No. 47.) Respondents responded to Pollard's letter on May 10, which drew a further opposition from Pollard the same day.  (ECF Nos. 48 & 49.)  The Court granted respondents' request for an extension of time; their opposition is now due June 10, 2016, with Pollard's reply briefing due June 30, 2016.  (ECF No. 50.)

II.   ANALYSIS

The possible need to consider <u>ex parte</u> submissions in this case stems from the Court's obligation to provide a limited but careful review of the Parole Commission's special conditions decision.  One important factor in evaluating those conditions is the nature, value, and continuing danger of any information Pollard accessed before his incarceration.[2]  There are competing entries in the record on this point:  Pollard points to declarations from Robert C. McFarlane, the former U.S. National Security Advisor, and former senator Dennis DeConcini, a former member of the Senate Intelligence Committee, both of whom concluded that any information Pollard could still recall would be of no value, while respondents note a letter from James R. Clapper, the Director of National Intelligence, in which Clapper affirmed that the information remained properly classified.  (ECF Nos. 4, Exhs. C & D; 38, Exh. D.)  Although it might be possible to resolve the question solely on these public

---

[2] Although the parties and the Court have at times suggested that the relevant inquiry is what information Pollard "carries in his head" (<u>see, e.g.,</u> ECF No. 27 at 16), the inquiry is more accurately stated as what information he was able to access and therefore <u>may</u> carry in his head.

declarations, the Court anticipates that a limited review of the materials actually at issue may bring further clarification to these proceedings.  Because those materials are classified national security documents (indeed, that is their relevance to this proceeding), their distribution must be carefully limited.

Pollard's objections to respondents' proposed ex parte submissions fall into two principal categories: an argument that such submissions are inconsistent with Pollard's right to due process, and an argument that Pollard's counsel are entitled to access the information under the standard set forth in Executive Order 13526. The Court considers both of these arguments separately.

A.    Due Process

Pollard argues that "[d]ue process mandates" that the Court's determination of the validity of the special conditions "be made on an adversarial basis."  (ECF No. 46 at 2.)  He further argues that any ex parte submission would be inconsistent with the adversarial process and thereby violate his right to due process.

Some courts have flatly held that "a parolee 'does not have a protected liberty interest in being free from special conditions.'"  Cusamano v. Alexander, 691 F. Supp. 2d 312, 319 (N.D.N.Y. 2009) (quoting Pena v. Travis, No. 01 Civ. 8534 SAS, 2002 WL 31886175, at *13 (S.D.N.Y. Dec. 27, 2002)).  These courts reason that the "constitutional purpose [of due process] is to protect a substantive interest to which the individual has a legitimate claim of entitlement," and that the delegation of special conditions to a parole commission's discretion precludes such a claim.  Olim v. Wakinekona, 461 U.S. 238, 250 (1983).  As discussed above, the only statutory

7

requirement imposed on special conditions for federal parolees is that they be
"reasonably related to (1) the nature and circumstances of the offense; and (2) the
history and characteristics of the parolee," and the Commission has the further
authority to "provide for such supervision and other limitations as are reasonable to
protect the public welfare."  18 U.S.C. § 4209(a).

The better view, however, is that parolees are entitled to some form of due
process in the imposition of special conditions of parole.  The Supreme Court has
held that, although "the full panoply of rights due a defendant in [a criminal
prosecution] does not apply to parole revocations," due process interests are
nonetheless implicated by such terminations.  Morissey v. Brewer, 408 U.S. 471,
480 (1972).  The Second Circuit Court of Appeals has evaluated whether a special
condition imposed by the federal parole authority was "so vague as to infringe due
process."  Birzon v. King, 469 F.2d 1241, 1243 (2d Cir. 1972).  The Court of Appeals
rejected the petitioner's challenge but did not suggest that he had no due process
rights to assert.  See id. at 1242-43; see also Farrell v. Burke, 449 F.3d 470 (2d Cir.
2006) (rejecting due process challenges to special condition imposed by state parole
authority).  More recently, a court in this district has struck down a special
condition as unconstitutionally vague and thereby in violation of a parolee's right to
due process.  LoFranco v. U.S. Parole Comm'n, 986 F. Supp. 796, 808-11 (S.D.N.Y.
1997), aff'd 175 F.3d 1008 (2d Cir. 1999) (unpublished).  The view that some due
process rights attach to special conditions of parole also finds support in the related

field of conditions of supervised release, to which due process protections apply.

See, e.g., United States v. Green, 618 F.3d 120, 122 (2d Cir. 2010).

Neither party has directed the Court's attention to any discussion of the

process that a parolee challenging special conditions of his parole is due.  In

Mathews v. Eldridge, 424 U.S. 319 (1976), the Supreme Court held that

> identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Id. at 903.

Courts apply the flexible Mathews test in a variety of contexts, including in

determining whether a decision rendered on the basis of ex parte submissions

violates due process.  In United States v. Abuhamra, 389 F.3d 309 (2d Cir. 2004),

the Second Circuit strictly limited the use of ex parte submissions in opposition to

post-trial bail release.  The Court of Appeals's reasoning, however, illuminates

important differences between that case and the instant petition.

First, the private interest at issue in Abuhamra was "the most elemental of

liberty interests – the interest in being free from physical detention by one's own

government."  Id. at 318 (quoting Hamdi v. Rumsfeld, 542 U.S. 507, 529 (2004)).

Even in its diminished post-guilty-verdict form, this interest outweighs Pollard's

private interest in this case, enjoying his liberty as a parolee free from certain

special conditions.  Moreover, the statutory scheme governing bail decisions

imposed a burden of proof on the defendant and thereby anticipated that he would be provided "the opportunity to demonstrate that he satisfies [that] burden." Id. at 320. The statute governing the Parole Commission's imposition of special conditions does not contain the same provision. See 18 U.S.C. § 4209.

The government's position in this case is significantly stronger than it was in Abuhamra. There, the government's entire submission as to the defendant's dangerousness was submitted ex parte; there was no opportunity whatsoever for the defendant to respond to the submission. 389 F.3d at 316. In contrast, in the instant case the government represents that it "intends to respond to the renewed Petition in a public, unclassified filing" which it argues will provide an adequate basis to deny Pollard the relief he seeks; then, in addition, respondents propose to submit ex parte "a classified submission addressing the types of classified information at issue." (ECF No. 48 at 1.) This preserves much more of the adversarial process than did the approach Abuhamra rejected, and it particularly addresses the public's interest in "an opportunity to see that justice was done." 389 F.3d at 323.

In addition, the government's interest in this case is not, as it was in Abuhamra, "limited to the protection of its confidential witnesses' identities and safety." Id. at 324. None of the evidence submitted ex parte in Abuhamra was classified on the basis of national security, and the Second Circuit confirmed through its own ex parte review that "disclosure of the evidence itself would not have compromised national security." Id. The Court remarked that had the

materials implicated national security, it would have been "obliged to conduct a very different analysis of Abuhamra's due process claim than the one in which [it] [t]here engage[d]." Id. That is precisely the situation before the Court in the instant petition – the classified materials at issue are not classified because they implicate informants, but because they purportedly affect national security.

Taken together, these distinctions indicate that the government's interest is stronger in the instant case than it was in Abuhamra and Pollard's private interest in testing the special conditions of his parole is less compelling than was Abuhamra's interest in post-verdict bail.  Nonetheless, the procedures detailed by the Abuhamra court provide a useful framework and starting point by which to consider the use of ex parte materials.  In that case, ex parte submissions were limited to situations in which six circumstances were met:

> (1) the government advances an overriding interest that is likely to be prejudiced by disclosure of the evidence at issue, (2) the order sealing the evidence is no broader than necessary to protect that interest, (3) the district court considers reasonable alternatives to proceeding ex parte, (4) the court makes findings adequate to support an ex parte proceeding, (5) the government discloses the substance of its ex parte submission to the defense, and (6) the district court engages in heightened scrutiny of the reliability of the ex parte submissions.

Id. at 332.  In the Court's view, this memorandum opinion and order, along with the proposed approach outlined in the letters from Pollard and respondents, adequately addresses all of the circumstances other than the fifth.  The Court will therefore require that the government disclose to Pollard's attorneys the "gist or substance" of its submission, id. at 330, at a high level of generality that will not disclose classified information.  This disclosure may either be contained in the publicly filed

11

opposition to the renewed petition or filed separately under seal in a brief submission to which Pollard's counsel will have access.

     B.   <u>Executive Order 13526</u>

Executive Order 13526, 75 Fed. Reg. 707 (Dec. 29, 2009) sets out the current standards by which national security information is classified and by which certain individuals are permitted to access that classified information.  The Order requires that "an original classification authority," defined as the President, Vice President, agency heads, and certain other designees and delegatees, classify the information in the first place.  E.O. 13526 §§ 1.1(a)(1); 1.3(a).  Once the information is classified, a person may access it, "provided that (1) a favorable determination of eligibility for access has been made by an agency head or the agency head's designee; (2) the person has signed an approved nondisclosure agreement; and (3) the person has a need-to-know the information."  <u>Id.</u> § 4.1(a).  The order further explains that "need-to-know" refers to "a determination within the executive branch in accordance with directives issued pursuant to this order that a prospective recipient requires access to specific classified information in order to perform or assist in a lawful and authorized governmental function."  <u>Id.</u> § 6.1(dd).

Pollard does not challenge the "original classification authority's" role in classifying the relevant information in the first place.  (ECF No. 46 at 2.) Respondents do not dispute that Pollard's counsel has signed an approved nondisclosure agreement.  (ECF Nos. 48 & 46 Exhs. A & B.)  The parties' disagreement about the proper application of Executive Order 13526 therefore

comes down to the validity of the executive branch's determination that Pollard's counsel does not have the appropriate "need-to-know." (ECF No. 48 at 2.)

Pollard argues that the government's "need-to-know" determination is vulnerable to challenge before the Court and should be overturned. In his view, "by injecting the materials into the dispute, the Government creates the 'need to know' contemplated in Executive Order 13526." (ECF No. 49 at 1.) In addition, he argues that his "long-time pro bono attorneys are intimately familiar with the case and will play a pivotal role in the process of reviewing the documents and advocating Mr. Pollard's rights to the court." (ECF No. 46 at 3.)

Federal courts have addressed whether an individual "needs-to-know" certain information surprisingly infrequently, and what little case law there is does not cohere around a single approach or even multiple well-defined competing approaches.

Some courts have shown great reluctance to enter this arena at all. Indeed, Pollard himself has previously encountered such a decision. In United States v. Pollard, 416 F.3d 48 (D.C. Cir. 2005), the D.C. Circuit rejected Pollard's argument that his attorney "demonstrated a 'need to know' what was in [certain classified] materials in order to prepare his clemency petition." Id. at 53. The court there concluded that it "lack[ed] the authority to compel the executive branch to disclose any documents for the purposes of a clemency petition," highlighting that clemency decisions are "the exclusive province of the Executive." Id. at 56, 57. Apart from this separation of powers argument, the court also noted that, "[a]s a practical

matter, granting Pollard or his counsel access to these materials would almost surely open a floodgate of similar requests," and thus create an "undue burden" on the executive branch.  Id. at 57.

The Pollard court's hesitance to adjudicate questions of access to national security information finds significant support in other federal precedent.  In Department of Navy v. Egan, 484 U.S. 518 (1988), the Supreme Court ruled that an administrative board lacked the authority to examine the merits of "the grant of security clearance to a particular employee, a sensitive and inherently discretionary judgment call, [which] is committed by law to the appropriate agency of the Executive Branch."  Id. at 527.  The Court explained that "the protection of classified information must be committed to the broad discretion of the agency responsible, and this must include broad discretion to determine who may have access to it."  Id. at 529.  Moreover, the Court deemed it "not reasonably possible for an outside nonexpert body to review the substance of such a judgment."  Id. Respondents in this case cite Egan for the proposition that there is "clear law that the authority to determine who may have access to classified information" lies with the executive branch.  (ECF No. 44 at 3.)

However, the Constitutional and practical considerations that counsel so strongly in favor of judicial non-interference when the question is whether an individual can be trusted are less forceful when the question is whether a trusted individual needs to know certain information.  Although Executive Order 13526 § 6.1(dd) refers to an executive branch determination of what access is required, it is

14

not clear, as a Constitutional and practical matter, that the executive branch's responsibility for and expertise in matters of foreign policy and national security renders it better-equipped than other actors to determine what information a litigant or other individual needs to know.

The view that a "need-to-know" determination is not beyond the Court's purview finds support in cases in which courts have passed on precisely that determination.  In <u>United States v. Libby</u>, 429 F. Supp. 2d 18 (D.D.C. 2006), the district court for the District of Columbia rejected the argument that the executive's determination about whether an individual could receive certain classified documents was not reviewable.  Instead, the court ordered that an <u>ex parte</u> submission from the government be accompanied by an <u>ex parte</u> justification for the <u>ex parte</u> nature of the submission in the first place.  <u>Id.</u> at 25.  The required filing was to describe the reason the information was classified, the harm that would follow from its disclosure, and the reason defendant lacked the requisite "need-to-know."  <u>Id.</u>  Based on this filing, the court planned to "determine whether the filing should remain <u>ex parte</u>, or whether all or some portion of it should be provided to the defendant."  <u>Id.</u>  The <u>Libby</u> court did not state whether and to what extent it would defer to the executive's initial decision regarding the "need-to-know" factor.

District courts in this circuit have also taken it as their role, in at least some circumstances, to determine whether an individual needs to know certain information.  In <u>El Badrawi v. Dep't of Homeland Sec.</u>, 596 F. Supp. 2d 389 (D. Conn. 2009), a FOIA case, the government moved to submit a classified declaration.

15

Id. at 399-400.  The only dispute between the parties was over whether plaintiff's attorney needed to know the information in the declaration.  "[T]he court held that it could not rule on whether [the attorney] had a 'need to know' without first reviewing the Declaration in question.  The court subsequently reviewed the classified DOS Declaration, and it … concluded that [the attorney did] not need to know the information contained therein."  Id. at 400.  The El Badrawi court did not state what deference, if any, it applied to the executive branch's initial determination that plaintiff's attorney lacked the requisite "need-to-know."

The most sustained examination of the judiciary's role in determining a litigant's "need-to-know" comes in a decision of uncertain continuing value even as persuasive precedent.  As discussed below, the district court's decision in Stillman v. Department of Defense, 209 F. Supp. 2d 185 (D.D.C. 2002), was ultimately reversed by Stillman v. CIA, 319 F.3d 546 (D.C. Cir. 2003), on grounds different from, but related to, that court's treatment of the "need-to-know" question.  Nonetheless, the district court's analysis in Stillman offers some guidance.

Stillman concerned prepublication review by the CIA and Department of Defense of a book on China's nuclear weapons program written by a former employee of the Los Alamos National Laboratory.  209 F. Supp. 2d at 188.  Plaintiff's counsel was denied access to the classified portions of the manuscript at issue on the basis that he lacked the requisite "need-to-know."  Id. at 189-90.  The submissions from the officials that had made this determination explained that the attorney was "not performing a governmental function in bringing a lawsuit but

16

rather is pursuing personal interests." Id. at 192.  The officials further clarified that because the information at issue was "extremely sensitive," there was a "corresponding need to construe and apply the need-to-know requirement strictly." Id.  In addition to these explanations, the government also argued that subjecting the decision to judicial review violated the separation of powers.  Id. at 193.

The district court forcefully disagreed with the government's contention that it lacked the authority to adjudicate the "need-to-know" determination.  The court noted the judiciary's important role in vindicating the First Amendment interests that plaintiff asserted and rejected the government's arguments as proving too much and seeking to make all topics touching national security unreviewable.  Id. at 194-212.  The court paid special attention to the fact that "[a] denial of access based on [a determination that an attorney is not performing or assisting with a governmental function] presents a very different question than a denial of access based on the predicted risk to national security caused by release of the information."  Id. at 195.  "The 'predictive judgment' about an individual's risk to national security with which the Court in Egan was so concerned, and the Article II implications that follow, does not accurately describe the judgment that the DOD and the CIA claim to have made in this case."  Id. at 208.  The Stillman district court also noted the difficulty that stems from "the fact that the Executive Order these officials were purporting to apply does not allow for considerations of risk to security to impact the need-to-know determination."  Id. at 196 n.6.  The district court ultimately concluded that the decision to withhold the materials from

plaintiff's counsel violated the First Amendment and ordered the government to perform a background check on counsel and, if he proved trustworthy, provide him with access to the materials.  Id. at 230-31.

The Court of Appeals for the District of Columbia Circuit reversed.  Stillman v. Central Intelligence Agency, 319 F.3d 546, 549 (D.C. Cir. 2003).  The circuit court concluded that the district court had abused its discretion by deciding the First Amendment claim before determining whether the government had classified the information properly, thereby violating the constitutional avoidance doctrine.  Id. at 548.  It remanded the matter for an in camera review of the materials in the first instance.  Id. at 548-49.  On remand, "[a]fter reviewing in camera detailed affidavits from officials at several government agencies who seek to classify this information, and after reviewing the manuscript and public source documents provided to the government by Stillman," the district court concluded that the materials were properly classified, and thus granted judgment for the government.  Stillman v. Central Intelligence Agency, 517 F. Supp. 2d 32, 39 (D.D.C. 2007).

The original Stillman district court decision thus stands in the awkward (for precedential purposes) position of having been reversed without significant examination of its reasoning.  Its persuasive value to the instant case is also diminished by the fact that the plaintiff in Stillman claimed a First Amendment injury.  The Stillman court repeatedly emphasized the First Amendment implications of plaintiff's case, noting "the strong presumption of judicial review of constitutional claims" and rejecting the applicability of decisions like Egan that did

not challenge the government's withholding of materials as inconsistent with the Constitution.  209 F. Supp. 2d at 207, 208, 210-11.  It should also be noted that, notwithstanding the district court's full-throated defense of the judicial role in reviewing the "need-to-know" determination, the <u>Stillman</u> decision still pledged to conduct its review "with appropriate deference to the expertise of the Executive Branch where such deference is warranted."  <u>Id.</u> at 204.

In light of the preceding discussion, the Court concludes that it is appropriate for the Court to review respondents' determination that Pollard's counsel does not need to know the information contained in any <u>ex parte</u> filings.  The Court's review will be appropriately deferential to Executive expertise, but will not be a rubber stamp for an agency decision.  The procedure by which the Court will carry out this duty tracks the procedure identified in the <u>Libby</u> case.  The government must justify the necessity of any <u>ex parte</u> filing by including an <u>ex parte</u> declaration or affidavit from an intelligence community official describing why Pollard's counsel does not need to know the information contained in the filing.  "Upon receipt of such a filing, the Court will review it and determine whether the filing should remain <u>ex parte</u>, or whether all or some portion of it should [be] provided to the defendant." <u>United States v. Libby</u>, 429 F. Supp. 2d 18, 25 (D.D.C. 2006).

III.    CONCLUSION

For the reasons stated above, respondents will be permitted to submit an <u>ex parte</u> filing addressing the types of classified information at issue alongside their public, unclassified filing, as anticipated by the Court's April 12, 2016 order and

19

described in respondents' May 10, 2016 letter.  (ECF Nos. 40 & 48.)  They must also, however, disclose the general substance of the submission to Pollard's counsel and include as part of any ex parte submission an explanation of the reason Pollard's counsel was determined not to need to know the information contained in the submission.  Because this memorandum opinion and order adds certain requirements to respondents' opposition, which is due shortly, the Court would likely grant a brief, one-week extension of the briefing schedule if requested in order to permit the respondents to create the necessary summary and justification.

Finally, the Court notes that the instant memorandum opinion and order is necessarily crafted without the benefit of the actual materials in question or briefing from the parties about the actual materials, summaries, and justifications anticipated by this opinion.  Once these issues are fully joined, it is possible the Court will either grant a party's request for additional briefing on this topic if one is made, or request such briefing from the parties sua sponte.

SO ORDERED.

Dated:      New York, New York
            June 6, 2016

_____
      KATHERINE B. FORREST
      United States District Judge

20