UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

JONATHAN J. POLLARD,

                  Petitioner,

        -v-

UNITED STATES PAROLE COMMISSION; J.
PATRICIA WILSON SMOOT, solely in her
capacity as Chair of the United States Parole
Commission; UNITED STATES PROBATION
OFFICE FOR THE SOUTHERN DISTRICT OF
NEW YORK; MICHAEL J. FITZPATRICK,
solely in his capacity as Chief U.S. Probation
Officer,

                  Respondents.

------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 11, 2016

15-cv-9131 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

In this action, petitioner Jonathan J. Pollard challenges certain special conditions imposed by respondent United States Parole Commission and implemented by respondent United States Probation Office for the Southern District of New York.  (ECF Nos. 1 & 36.)  For the reasons stated below, Pollard's petition for a writ of habeas corpus is hereby DENIED.

I.    LITIGATION HISTORY

In 1984 and 1985, Pollard, then an Intelligence Research Specialist with the United States Navy, delivered classified information to the State of Israel.  (ECF No. 1 at ¶ 1.)  On June 4, 1986, pursuant to a written plea agreement, he pled guilty to one count of conspiracy to deliver national defense information to a foreign

government, in violation of 18 U.S.C. § 794(c).  (Id. at ¶ 21; ECF No. 3, Exh. B.)  On March 4, 1987, he was sentenced to life in prison.  (ECF No. 1 at ¶ 22.)

Under the parole statutes in place at the time Pollard pled guilty, he was entitled to be released on parole after serving thirty years unless the Parole Commission "determine[d] that he ha[d] seriously or frequently violated institution rules and regulations or that there [wa]s a reasonable probability that he w[ould] commit any Federal, State, or local crime."  18 U.S.C. § 4206(d) (1985).

As the thirtieth anniversary of Pollard's imprisonment approached, his attorney submitted declarations from two former government officials.  The man who served as National Security Advisor at the time of Pollard's arrest attested that any information Pollard recalled "would have no value to anyone today," and a retired Senator who served on the Senate Select Committee on Intelligence at the time of Pollard's arrest attested that he had "reviewed the content of the classified portion of the Pollard file when [he] still had the ability to do so," and did "not believe any such information would be valuable to anyone."  (ECF No. 3, Exhs. C & D.)  The government notified Pollard's attorney that it did not intend to advocate to the Commission that there was a reasonable probability Pollard would commit a crime if released.  (Id. Exh. E.)

On July 7, 2015, the Parole Commission conducted a mandatory parole hearing.  (ECF No. 22, ¶ 4.)  The ensuing Post Hearing Assessment noted, among other things, Pollard's acknowledgment of his errors and responsibilities and the fact that he had a job as an analyst, as well as an apartment, promised to him.  (Id.

2

Exh. A.)  The Examiner opined that Pollard "should be released on mandatory parole," and also that "he should have special conditions for GPS monitoring and computer monitoring."  (Id.)

On July 28, 2015, the Parole Commission issued a Notice of Action which granted Pollard his mandatory parole, thereby implicitly finding that he neither seriously or frequently violated institution rules nor posed a reasonable probability of future crimes.  (ECF No. 1 at ¶ 30; ECF No. 3, Exh. F.)  The Commission scheduled Pollard's release for November 20, 2015.  (Id.)

In the Notice of Action granting parole, the Commission also imposed conditions of release pursuant to its authority under 18 U.S.C. § 4209(a).  Two of the special conditions of release included in the Notice are at issue in this proceeding.  First, the Commission ordered that Pollard would be "subject to the Global Positioning Systems monitoring inclusive of a curfew and/or exclusion zones as determined by [his] U.S. Probation Officer."  (ECF No. 3, Exh. F.)  Second, the Commission ordered that Pollard

> (1) consent to [his] probation officer and or probation service representative conducting periodic unannounced examinations of [his] computer(s) equipment which may include retrieval and copying of all memory from [his] computer(s) and any internal or external peripherals to ensure compliance with this condition and/or removal of such equipment for the purpose of conducting a more thorough inspection; and (2) consent at the direction of [his] probation officer to having installed on [his] computer(s), at [his] expense, any hardware or software systems to monitor [his] computer use.  (Id.)

Pollard appealed the imposition of these requirements to the Parole Commission's National Appeals Board.  (ECF No. 1 at ¶ 36; ECF No. 22, Exh. B.)

The Board removed one condition[1] included in the prior Notice of Action as "not the least restrictive means available," and affirmed both of the conditions now at issue. (ECF No. 3, Exh. G.)  In so doing, the Board clarified that the computer monitoring condition applied "regardless of whether it is a personal communication device, home computer, or a computer you use for employment because, as a practical matter, the boundaries between personal and business computer use are blurred." (Id.)  The Board ruled that this condition would "assist the U.S. Probation Office with ensuring that you are complying with your ongoing obligations under the terms of the plea agreement."  (Id.)  It further ruled that the GPS monitoring condition was "reasonably related to [Pollard's] offense that involved covert conduct to obtain and sell national security information to a foreign government" and "reasonably related to the need to deter [him] from further criminal conduct."  (Id.)

Upon Pollard's release, he was required to visit the Probation Office for the Southern District.  (ECF No. 8 at ¶ 3.)  He did on November 20, 2015, the day he was released from prison.  (Id.)  During the visit he signed an agreement requiring him to, among other things, respond promptly to his probation officer's calls and visits and obey, with limited exceptions, a 7:00 p.m. to 7:00 a.m. curfew.  (Id. at ¶¶ 4 & 7, Exh. H.)  The Probation Office also provided Pollard with a GPS monitor to be worn on his wrist.  (Id. ¶ 5, Exh. I.)  During subsequent meetings between Pollard, his counsel, and the Probation Office, the Office informed Pollard that he could

---

[1] The Parole Commission had originally prohibited Pollard from using any computer with access to the internet without the Commission's prior written approval.  (ECF No. 3, Exh. F.)

request modifications to his curfew for events or changed circumstances, such as securing employment.  (ECF No. 20 ¶ 14.)  On November 24, 2015, the Office agreed to modify Pollard's curfew to accommodate his observance of the Sabbath, such that it would not begin until 11:00 p.m. on Friday nights and would end at 6:00 a.m. on Saturday mornings.  (Id. ¶ 19.)  The Probation Office has continued to remind Pollard that he is permitted to request further modifications to his curfew, including through informal telephone calls, but to date Pollard has not requested another change.  (ECF No. 58 ¶¶ 15-17.)

Pollard's counsel, who obtained the financial analyst job offer that awaited Pollard upon his release, has since recommended to the employer that any start of employment await the determination of the challenge to the computer monitoring condition.  (ECF No. 25 at 3 n.2.)  Accordingly, Pollard has not worked since his release.  There is no evidence in the record that the potential employer in fact objected to hiring Pollard based on the imposed conditions or any other factor.  (ECF No. 58 ¶ 18.)  The Probation Office's computer monitoring software "is highly customized and individualized," and the Office has offered to "work with the employer to account for [any] concerns [about the government's access], or to block the computer user from certain types or areas of usage."[2]  (Id. ¶ 20.)

The same day he was released from prison and first met with the Probation Office in this district, November 20, 2015, Pollard filed the original petition for a

---

[2] The Court notes that throughout this litigation the Probation Office has both committed to and demonstrated flexibility in the manner in which the three challenged conditions are implemented.

writ of habeas corpus pursuant to the Court's authority under 28 U.S.C. § 2241 in this matter, seeking an order that respondents eliminate the GPS monitoring and computer monitoring conditions, which he challenged as inconsistent with federal parole statutes and regulations, the federal Religious Freedom Restoration Act, and the Constitution.  (ECF No. 1.)  The parties briefed the matter on an expedited basis, and the Court heard oral argument on December 14, 2015.  (ECF No. 27.)

Ruling orally from the bench, the Court expressed its view that "the record of the Parole Commission's reasons … is insufficient to support the nature and the breadth of the restrictions."  (Id. at 12.)  The Court therefore remanded the matter to the Commission to provide it with "an opportunity … to more fully set forth its rationale."  (Id.)  The Court also identified what it took, under the record then before it, to be a "fundamental issue": "whether there is anything that Mr. Pollard can disclose that would endanger the public;" in other words, "is there any confidential government information left to disclose?"  (Id.)  The Court directed the Commission to "grapple with this question," which, although "not something which necessarily is required to support the restrictions," would nonetheless "certainly go a long way to supporting the restrictions."  (Id. at 13.)  The Court left the contested conditions in place during the remand.  (Id. at 17; ECF No. 26.)

On remand, Pollard submitted memoranda setting out his position to the Parole Commission.  (ECF No. 38, Exhs. C & E.)  The Commission also received, among other things, a letter from Director of National Intelligence James R. Clapper dated February 10, 2016.  (Id., Exh. D.)  Clapper's letter explained, among

other things, that the United States Intelligence Community had "confirmed that certain information compromised by Mr. Pollard remains currently and properly classified at the Top Secret and Secret levels." (<u>Id.</u>)

On March 2, 2016, the Parole Commission published a four-page, single-spaced Notice of Action relating to Pollard's conditions. (<u>Id.</u>, Exh. G.) The Commission upheld both the GPS monitoring and computer monitoring conditions and provided additional reasoning not present in its July 2015 Notice of Action.

The Notice first addressed the GPS monitoring condition, which it found reasonably related to the nature and circumstances of Pollard's offense, his history and characteristics, and the deterrent and public-protecting purposes of criminal sentencing. (<u>Id.</u> at 1.) The Commission found that Pollard had "a history of deception and an expressed desire to leave the country," both of which could be addressed by GPS tracking. (<u>Id.</u>) It also determined that this this condition would encourage compliance with Pollard's plea agreement, which he had "previously demonstrated a propensity to violate" when he "violated a gag order" a federal judge had issued by speaking with a journalist before his sentencing without giving required prior notice. (<u>Id.</u> at 2.) The Notice of Action further recounted that Pollard "compromised information that remains classified at the Top Secret and Secret levels and future unauthorized disclosure of the information could risk harm to the national security of the United States." (<u>Id.</u> at 2.)

As to the computer monitoring condition, the Parole Commission similarly found it reasonably related to the nature and circumstances of Pollard's offense, his

history and characteristics, and the deterrent and public-protecting purposes of criminal sentencing.  (Id. at 3.)  The Commission reasoned that this monitoring would help ensure Pollard obeyed the requirements of his plea agreement that he not disclose classified information and that he submit any publications for review. (Id.)  The Notice again found Pollard's violation of a gag order relevant, and further noted that he attempted to send letters containing classified information from prison 14 times during his incarceration and that the Bureau of Prisons prohibited him from computer access.  (Id. at 3-4.)  The Commission also determined that Pollard had "demonstrated a recent propensity to dissemble," through his representations about the employment waiting for him after parole, and through his consistent self-representation "as a 'White Knight' for Israel," which the Commission determined was an inaccurate characterization of his actions.  (Id. at 4.)  As a result of these findings, the Parole Commission maintained the two challenged special conditions of parole.

On April 8, 2016, Pollard moved to re-open the case and renew his petition. (ECF No. 36.)  The Court re-opened the case and set a briefing schedule.  (ECF Nos. 40 & 41.)  As part of that order, the Court noted that "respondents may deem it appropriate to address whether information at issue remains 'Secret' or 'Top Secret.'"  (ECF No. 40 at 1.)  The Court therefore directed the parties to "confer as to whether (1) the Court can or should resolve such factual disputes; (2) the standard that would apply; and (3) whether respondents should/must support their position

on this motion with reference – <u>in camera</u> – to specific examples of 'Secret' or 'Top Secret' information deemed to be at risk." (<u>Id.</u> at 1-2.)

On May 6, 2016, respondents moved for an extension of time to oppose Pollard's renewed petition. (ECF No. 44.) The letter also expressed an "intention to support [respondents'] response to the renewed Petition with a classified submission for the Court's <u>ex parte</u> and <u>in camera</u> review." (<u>Id.</u> at 1.) Pollard filed a letter on May 9 objecting to the proposed use of <u>ex parte</u> submissions. (ECF No. 47.)

On June 6, 2016, the Court published a memorandum opinion and order addressing the proper role of <u>ex parte</u> evidence in this proceeding. (ECF No. 51.) After surveying the case law and constitutional principles the parties invoked, the Court permitted the government to submit <u>ex parte</u> materials, but only if it also "disclose[d] the general substance of the submission to Pollard's counsel" and included "an explanation of the reason Pollard's counsel was determined not to need to know the information contained in the submission." (<u>Id.</u> at 20.)

In the end, the government did not submit any <u>ex parte</u> evidence to the Court for review. (ECF Nos. 56-59.) Respondents noted their disagreement with the Court's memorandum opinion and order, but argued that an <u>ex parte</u> submission was not necessary in light of the letters submitted to the Parole Commission by Director Clapper and a public declaration of Jennifer L. Hudson, Director of the Information Management Division for the Office of the Director of National Intelligence. (ECF No. 56.) Hudson's declaration stated that "certain information believed to have been compromised by Mr. Pollard remains currently

and properly classified at the Top Secret and Secret levels." (ECF No. 59 at 6.) The declaration further explained that disclosure of some of the information Pollard is believed to have accessed "holds the potential of revealing intelligence collection methods and techniques … still in use by the Intelligence Community today," including the identity of human sources of intelligence. (Id. at 7-8.)

Pollard submitted a reply in support of his renewed petition on July 7, 2016, and the Court heard oral argument from both parties on July 22, 2016.

## II.   LEGAL STANDARDS

### A.   Parole Statutes and Regulations

A prisoner who is granted parole "remain[s] in the legal custody and under the control of the Attorney General, until the expiration of the maximum term or terms for which such parolee was sentenced." 18 U.S.C. § 4210(a). It has been described, by both the Supreme Court and other courts, as "closely analogous to supervised release following imprisonment." Johnson v. United States, 529 U.S. 694, 710-711 (2000). However, while courts impose terms of supervised release, see 18 U.S.C. § 3583, parole decisions are committed to the exclusive discretion and jurisdiction of the United States Parole Commission. 18 U.S.C. §§ 4206, 4209. Although federal parole was abolished for later-sentenced individuals in 1984, the Parole Commission retains jurisdiction over inmates who committed a federal offense before November 1, 1987. Comprehensive Crime Control Act of 1984 (Pub. L. 98-473, Oct. 12, 1984).

Federal statutes and regulations in place at the time of Pollard's unlawful conduct and sentencing created a regime for the imposition of conditions of parole for federal parolees.  Under 18 U.S.C. § 4209(a), the Parole Commission is required to impose certain conditions and further authorized to "impose or modify other conditions of parole to the extent that such conditions are reasonably related to (1) the nature and circumstances of the offense; and (2) the history and characteristics of the parolee."  The same statute further authorizes the Commission to "provide for such supervision and other limitations as are reasonable to protect the public welfare."

Federal regulations require that special conditions of release be "reasonably related to the nature and circumstances of [the parolee's] offense or [the parolee's] history and characteristics, and at least one of" three purposes: the need for individual deterrence; protecting the public from further crimes; or the parolee's need for training, treatment, or care.  28 C.F.R. § 2.40(b).  The Parole Commission "will also consider whether the condition involves no greater deprivation of liberty than is reasonably necessary for the purposes of deterrence of criminal conduct, protection of the public from crime and offender rehabilitation."  Id.

B.    Judicial Review of Special Conditions of Parole

"Federal court review of parole commission decisions is extremely limited, because the commission has been granted broad discretion to determine parole eligibility."  Bialkin v. Baer, 719 F.2d 590, 593 (2d Cir. 1983) (citing 18 U.S.C. § 4218(d)).  Courts apply the same deferential standard when a parolee challenges

11

special conditions imposed by the Commission.  <u>LoFranco v. United States Parole Comm'n</u>, 986 F. Supp. 796, 803-04 (S.D.N.Y. 1997).  "The appropriate standard for review of the commission's decisions is whether there has been an abuse of discretion.  This means that a court may not substitute its own judgment for that of the commission, but may consider only whether there is a rational basis for the commission's decision."  <u>Bialkin</u>, 719 F.2d at 593 (internal citations omitted).

"The essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence."  <u>Morrissey v. Brewer</u>, 408 U.S. 471, 477 (1972).  Those rules "restrict [parolees'] activities substantially beyond the ordinary restrictions imposed by law on an individual citizen."  <u>Id.</u>  Indeed, the Second Circuit has held that just as "the Government can infringe the [constitutional] rights of prisoners so long as the restrictions are reasonably and necessarily related to the advancement of some justifiable purpose of imprisonment," so too can the government impose substantial, otherwise-impermissible restrictions "when a convict is conditionally released on parole" without violating the Constitution.  <u>Birzon v. King</u>, 469 F.2d 1241, 1243 (2d Cir. 1972).

Nonetheless, the Commission must comport with the statutes and regulations which govern its discretion, and "the Court may review constitutional claims arising from Parole Commission actions."  <u>LoFranco</u>, 986 F. Supp. at 804 n.7 (citing <u>Billiteri v. United States Board of Parole</u>, 541 F.2d 938, 944 (2d Cir. 1976)). In the analogous circumstance of an appellate court's review of a district court's

imposition of special conditions of supervised release, the Second Circuit has "cautioned that [it] will 'carefully scrutinize unusual and severe conditions.'" United States v. Sofsky, 287 F.3d 122, 126 (2d Cir. 2002) (quoting United States v. Doe, 79 F.3d 1309, 1319 (2d Cir. 1996)).

Courts lack statutory authority to amend conditions of parole. See 18 U.S.C. §§ 4201-18. Therefore, where courts determine that a challenge condition does not pass judicial review, the appropriate course of action is to remand the condition to the Parole Commission for further consideration and proper action. See Billiteri, 541 F.2d at 946; LoFranco, 986 F. Supp. at 811.

C.    Religious Freedom Restoration Act

The Religious Freedom Restoration Act ("RFRA") provides that the federal government "may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person" is both "in furtherance of a compelling governmental interest" and "the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b).

As a threshold matter, a religious objector who invokes RFRA has the burden to show "a substantial burden on their exercise of religion." Catholic Health Care Sys. v. Burwell, 796 F.3d 207, 216 (2d Cir. 2015), vacated, 2016 WL 816249 (U.S. May 23, 2016) (citing City of Boerne v. P.F. Flores, 521 U.S. 507, 533 (1997)). "If the law's requirements do not amount to a substantial burden under RFRA, that is the end of the matter." Id. (alteration omitted) (quoting Priests for Life v. United States Dep't of Health & Human Servs., 772 F.3d 229, 244 (D.C. Cir. 2014)). A

substantial burden exists where the government "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." Jolly v. Coughlin, 76 F.3d 468, 477 (2d Cir. 1996). "[W]hether a law substantially burdens religious exercise under RFRA is a question of law for courts to decide, not a question of fact." Catholic Health Sys., 796 F.3d at 217 (quoting Priests for Life, 772 F.3d at 247.)

III.   ANALYSIS

   A.   The Special Conditions Are Supported By A Rational Basis And Are
        Valid Exercises Of The Parole Commission's Discretion

Pollard's primary challenge to the three special conditions at issue is that they do not comport with the relevant federal statutes and regulations which guide and limit the Parole Commission's discretion to set special conditions of parole and the Probation Office's discretion to achieve those conditions.  The Court's review of such a challenge is appropriately limited to the question of whether the Commission abused its discretion by acting without a rational basis for its decision.  Bialkin v. Baer, 719 F.2d 590, 593 (2d Cir. 1983).  None of the three special conditions Pollard challenges were adopted without a rational basis in the record.

      1.   Computer Monitoring

The first special condition Pollard challenges is the requirement that he consent to the Probation Office installing monitoring software on, and periodically examining, any personal computer, work computer, and smartphone he uses.  The Probation Office for the Southern District of New York "currently supervises … approximately 46 individuals who are subject to monitoring of their computers or other electronic devices."  (ECF No. 58, ¶ 22.)

14

The Parole Commission's March 2, 2016 Notice of Action presented significant reasoning in support of the computer monitoring condition. The Commission focused on "minimizing the risk that you will engage in criminal behavior by disclosing classified information to unauthorized sources" and ensuring "compliance with your plea agreement." (ECF No. 38, Exh. G at 3.) This focus was, as the Commission noted, "reasonably related to the nature and circumstances of the offense, the history and characteristics of the offender and the purposes of criminal sentencing under 18 U.S.C. § 3553 to: (1) deter the offender from further criminal conduct and to; (2) protect the public from further crimes." (Id.)

The Notice explained the basis for the Commission's concerns and the reasons it believed the computer monitoring condition helped to address them. The Commission noted that, in addition to the fact that Pollard's original offense centered on unauthorized disclosure of secret intelligence, Pollard had also engaged in subsequent conduct that raised concerns. For example, he had violated a gag order by speaking with a journalist about his case while he was awaiting sentencing. (Id.) He had also sent at least 14 letters during his first seven years of imprisonment that Navy intelligence censors deemed to contain classified information, in contravention of both the law and Pollard's plea agreement. (Id.)

Pollard argues that the Commission erred by considering these factors because the gag order violation was considered by the sentencing judge and because the letters simply demonstrated Pollard's compliance with the screening program in place for his communications from prison. Neither argument is persuasive. The

15

statute governing the Commission's authority to set special conditions does not limit the timeframe the Commission should consider in evaluating "the history and characteristics of the parolee," 18 U.S.C. § 4209(a)(2), and indeed the Commission is directed to consider a number of sources that predate a parolee's incarceration, including presentence investigation reports and the recommendations of the sentencing judge.  18 U.S.C. § 4207(3)-(4).  Similarly, the fact that there are multiple potential explanations for the presence of classified information in Pollard's letters is not a strike against the Commission's rationality or discretion. The Court is not tasked with evaluating which of several competing inferences the Parole Commission should have drawn from a particular piece of evidence, but is instead only concerned with whether there is a rational basis for the inference the Commission drew.  Bialkin v. Baer, 719 F.2d 590, 593 (2d Cir. 1983) ("[A] court may not substitute its own judgment for that of the commission." (citing Zannino v. Arnold, 531 F.2d 687, 691 (3d Cir. 1976))).

The Commission also addressed what it labeled Pollard's "recent propensity to dissemble."  (ECF No. 38, Exh. G at 4.)  The two pieces of evidence the Commission cited in support of this concern were Pollard's original statement that he had secured employment and later retraction in light of the special conditions of parole and Pollard's consistent representation of himself "as a 'White Knight' for Israel," which the Commission determined was inconsistent with evidence he had passed or attempted to pass intelligence to non-Israeli entities.  (Id.)

16

Pollard argues that the Parole Commission's interpretation of the events surrounding Pollard's offer of employment was "illogical" and the result of "cynicism." (ECF No. 37 at 15.)  But this argument is an invitation for the Court to replace the Commission's credibility determination with its own, which is precisely what courts are directed not to do in evaluating habeas petitions like this one. Iuteri v. Nardoza, 732 F.2d 32, 38 n.5 (2d Cir. 1984).  The Court cannot conclude that the Commission's interpretation of the evidence before it on this point was an irrational abuse of discretion.

Pollard also advances a broader argument against the computer monitoring condition: that he is no threat to disclose classified information because he retains no information that would in fact be dangerous to release.  Pollard has consistently advanced this position in connection with his parole, including through the submission of letters from government officials active in the intelligence community at the time of Pollard's offense who affirmed that the intelligence he accessed "would have no value to anyone today." (ECF No. 3, Exhs. C & D.)

Pollard's view is inconsistent with the letter submitted by Director Clapper, which was before the Parole Commission, and the declaration of Director Hudson, which was not.  Clapper's letter stated that elements of the United States Intelligence Community had "confirmed that certain information compromised by Mr. Pollard remains currently and properly classified at the Top Secret and Secret levels.  As such, future unauthorized disclosure of this information could risk harm to our national security." (ECF No. 38, Exh. D.)  Hudson's declaration describes

17

similar concerns about "certain information believed to have been compromised by
Mr. Pollard," which it explains could harm the country by "revealing intelligence
collection methods and techniques" that are still in use, as well as the identities of
human sources of intelligence.  (ECF No. 59, ¶¶ 10-12.)

The Commission was certainly within its discretion to credit Director
Clapper's characterization of the intelligence Pollard compromised over the
characterization advanced by Pollard's preferred sources.  The Hudson declaration
persuasively advanced multiple theories for the continued value of the intelligence,
including the theory that even if the specific intelligence Pollard accessed was no
longer relevant, it could nonetheless reveal sources, methods, and techniques.  The
Parole Commission could properly and rationally determine that this basis was
adequate to accept Director Clapper's view, and did not err by so doing.

Nor is the Court persuaded that the government's decision not to submit
particular examples of compromised intelligence for the Court's ex parte review
indicates any weakness or irrationality in the view that Pollard remains a risk for
disclosing classified information.  It bears repeating that the Court is tasked with
evaluating the decision the Parole Commission reached, not rendering a decision in
the first instance, and the Parole Commission's members "do not carry secret or top
secret clearances, and do not review classified information in handling parole
cases."  (ECF No. 57 ¶ 17.)  Thus, while the Court at various points indicated its
willingness to directly consider examples of the intelligence at issue, it never
suggested that such a review was necessary to decide Pollard's petition.  (ECF Nos.

40, 51.)  Placing too much weight on the Court's own survey of the compromised documents at issue risks both overstepping the limited scope of judicial review of Parole Commission decisions, <u>Bialkin</u>, 719 F.2d at 593, and acting without appropriate recognition "that information which appears harmless to the untrained judicial eye can be useful information to a sophisticated intelligence analyst."  <u>Nat'l Lawyers Guild v. Attorney General</u>, 96 F.R.D. 390, 401 n.21 (S.D.N.Y. 1982) (internal quotation marks omitted).

Pollard also argues that Director Hudson's referenced to "information believed to have been compromised" (ECF No. 59 ¶ 10) is a hedge because the government "should easily have been able to identify the specific documents Mr. Pollard <u>actually</u> accessed."  (ECF No. 62 at 6.)  Pollard's argument on this point depends on a number of documents in which government officials reference particular materials Pollard compromised and the reconstruction of an "inventory of compromised material."  (<u>Id.</u>, quoting ECF No. 64 Exh. D.)  However, it does not follow from the fact that the government knows much, or even most, of the information Pollard accessed that it can identify <u>all</u> such information; even the documents Pollard quotes in support of his argument reference "<u>approximate</u> numbers of compromised, published documents," not exact figures.  (<u>Id.</u> (emphasis added).)  The existence of some uncertainty does not render the government's submissions nor the Parole Commission's determinations fatally flawed.

Pollard's final argument against the computer monitoring condition is that it fails to achieve its aims and is thus irrational and not reasonable related to

19

deterrence or the prevention of future crimes.  (ECF No. 37 at 11-12.)  The Court

cannot agree.  The Parole Commission may properly act "[a]s long as there is a

reasonable nexus between the special condition of release and the crime for which

the individual was convicted."  LoFranco v. United States Parole Comm'n, 986 F.

Supp. 796, 804 (S.D.N.Y. 1997).  Pollard argues that his offense did not involve

computers and in fact predated the internet, but the government persuasively

responds that his offense involved the distribution of information, an activity most

efficiently accomplished using a computer in today's society.  The devices that will

be monitored are those Pollard is most likely to use for extended periods of time.

They are also those which Pollard can use without raising any questions about his

activities; in this, the monitored devices are unlike, to take an example raised at

oral argument, the computers at an internet café, which Pollard's probation officers

could know he visited by monitoring his GPS device.  The computer monitoring

condition, therefore, tends to deter further disclosure and protect the public from

further crimes.  18 U.S.C. § 4209(a).  Pollard's argument that unless the

government fully prevents him from speaking without monitoring it must also

permit him to use a computer without monitoring proves too much, particularly in

light of the regulatory direction that the Parole Commission "consider whether the

condition involves no greater deprivation of liberty than is reasonably necessary."

28 C.F.R. § 2.40(b).

 The Court concludes that the Parole Commission did not abuse its discretion

or act without a rational basis in imposing the computer monitoring condition.

2.    GPS Monitoring

The second special condition Pollard challenges is the requirement that he wear a GPS monitoring device at all times.  Monitoring by an electronic signaling device is explicitly anticipated by the Parole Commission's statutory authority to impose special conditions.  See 18 U.S.C. § 4209(c)(2).  The Probation Office for the Southern District of New York "currently supervises over 85 individuals who are subject to location monitoring," including Pollard.  (ECF No. 58, ¶ 22.)

The Parole Commission's March 2, 2016 Notice of Action presented significant explanation of its reasoning in support of the GPS monitoring condition.  The Commission focused on "minimizing the risk that you will flee the country and engage in further criminal acts."  (ECF No. 38, Exh. G at 1.)  This focus was, as the Commission noted, "reasonably related to the nature and circumstances of the offense, the history and characteristics of the offender and the purposes of criminal sentencing under 18 U.S.C. § 3553 to: (1) deter the offender from further criminal conduct and to; (2) protect the public from further crimes."  (Id.)

The Commission noted a number of evidentiary bases for its concerns as to flight.  First, it surveyed the deceptive nature of Pollard's criminal conduct, which had involved trips abroad, false identities intended to aid further trips, and attempts to seek asylum at the Israeli embassy after he was discovered.  (Id. at 1-2.)  The evidence in the record before the Parole Commission supports this description of Pollard's offense.  The Parole Commission's authorizing statute makes clear that the nature and circumstances of a parolee's offense, as well as other information

about the parolee's conduct before his conviction, is an appropriate basis for consideration.  18 U.S.C. §§ 4207, 4209(a)(1).

The Commission also cited more recent information suggesting a risk of flight, including Pollard's expressed desire to leave the United States for Israel and a request by members of Congress that he be allowed to do so.  (ECF No. 38, Exh. G at 1-2.)  Pollard has strenuously argued that these items only sought permission to take a legal action were an inappropriate basis for the GPS monitoring condition. However, there is no requirement that the Commission only consider evidence of criminal conduct or conspiracies; instead, it is tasked with crafting conditions which reasonably relate to Pollard's history and characteristics.  18 U.S.C. § 4209(a)(2). Pollard identifies no principle of law that suggests that a non-criminal characteristic cannot be considered, nor would such a principle be consistent with the goals and broad discretion of the Parole Commission.

In further explanation of its reasons for imposing GPS monitoring, the Commission also noted Pollard's propensity to violate binding conditions, including a gag order, and explained that the information he had compromised "remains classified at the Top Secret and Secret levels."  (ECF No. 38, Exh. G at 2.)  As discussed more fully above in connection with the computer monitoring condition, these considerations are valid and serious bases on which the Commission was permitted to act.  The fact that Pollard accessed information the disclosure of which "could risk harm to the national security of the United States" increases the peril

associated with his risk of flight and provides logical reinforcement for efforts aimed at minimizing that risk.

Although he has been paroled, Pollard remains in the custody of the United States Attorney General for the rest of his life sentence.  18 U.S.C. § 4210(a).  Any effort to leave the country would be inconsistent with that custody and violate Pollard's parole.  It would also, if successful, all but erase the United States' ability to ensure that Pollard complied with the terms of his plea agreement and committed no further crimes, including disclosure of information that remains classified.  The evidentiary record and the Parole Commission's explanations directly connect these concerns to the imposition of the GPS monitoring condition.  Accordingly, this condition is supported by a more than rational basis and its inclusion in Pollard's conditions of parole does not amount to an abuse of the Commission's discretion.

### 3.   Curfew

Pollard also challenges the Probation Office's imposition of a curfew as irrationally unrelated to the governing statutes and regulations.  As discussed above, Pollard is subject to a 7:00 p.m. to 7:00 a.m. curfew, with the exception of Friday nights when he may be out of his apartment until 11:00 p.m. and Saturday mornings, when he may leave his apartment starting at 6:00 a.m.  (ECF No. 20, ¶ 19.)

As discussed above, the record that has been compiled from the time of Pollard's offense through today demonstrates that it is rational and appropriate to

minimize the risk that he will either disclose information without authorization or flee the United States.  By restricting Pollard's movements to particular times, the curfew condition assists the Probation Office's monitoring efforts and thereby contributes to the minimization of those risks.  The twelve-hour curfew to which Pollard is subject most days of the week is "the most commonly imposed curfew condition for newly paroled individuals."  (ECF No. 58, ¶ 15.)  In addition, the Probation Office has already modified it once and has committed to permit further modifications where appropriate, a recourse Pollard has not sought since December 2015.  (Id. ¶¶ 15-17.)  The record as a whole thus demonstrates that the imposition of a curfew was not irrational, arbitrary, or otherwise an abuse of discretion.

> B.      The Special Conditions Do Not Violate The Constitution

Pollard's renewed petition does not assert a constitutional challenge to the special conditions imposed by the Parole Commission and Probation Office, nor did Pollard's counsel advance such an argument at oral argument on the renewed petition.  (ECF Nos. 37, 62.)  However, Pollard does include a footnote in his memorandum of law in support of his renewed petition which assets that the instant motion "is made on all prior pleadings and filings to date."  (ECF No. 37 at 18 n.4.)  Pollard's original submissions did advance constitutional challenges.  (ECF Nos. 4, 11-1.)  The Court therefore addresses these additional challenges.

Pollard's first constitutional argument is that the GPS monitoring condition and curfew violate various rights enshrined in the Constitution to the extent they restrict his right to move freely within this district and impair his career.  However,

there is no evidence in the record that the conditions actually interfere with travel in this district or Pollard's employment; the former concern is seemingly based on the incorrect view that GPS monitoring prohibits subway travel, while the latter is pure conjecture in the absence of more specific factual allegations.  Moreover, the liberty to which parolees are entitled is not absolute, but is instead conditional and dependent on the observance of special restrictions.  Morrissey v. Brewer, 408 U.S. 471, 480 (1972).  Thus, even if a travel restriction was the effect, that fact would not demonstrate a constitutional violation.  Pena v. Travis, No. 01 Civ. 8534 SAS, 2002 WL 31886175, at *12 n.5 (S.D.N.Y. Dec. 27, 2002).

Pollard's second constitutional argument is that the computer and GPS monitoring conditions violate the Fourth Amendment unless they are "narrowly tailored and bear a close and substantial relation to the government's interest in pursuing the searches."  (ECF No. 11-1 ¶¶ 66, 73.)  This is not an accurate statement of the law as it applies to parolees like Pollard after Samson v. California, 547 U.S. 843 (2006).  Pollard's argument relies on cases either decided before Samson or interpreting a statutorily, rather than constitutionally, imposed narrow tailoring requirement that applies to supervised release but not parole.  See, e.g., United States v. Malenya, 736 F.3d 554, 559-60 (D.C. Cir. 2013) ("Section 3583(d)(2) is thus, as the Seventh Circuit put it, a 'narrow tailoring requirement.'" (quoting United States v. Holm, 326 F.3d 872, 877 (7th Cir. 2003))).

Pollard's constitutional argument relies most heavily on United States v. Lifshitz, 369 F.3d 173 (2d Cir. 2004).  In that case, the Second Circuit considered a

Fourth Amendment challenge to a computer monitoring and filtering condition that was imposed as part of a three year term of probation following a guilty plea to one count of receiving child pornography.  Id. at 176-77.  The Lifshitz court evaluated this condition of probation under the "special needs" doctrine.  Id. at 179 (citing Griffin v. Wisconsin, 483 U.S. 868, 873-74 (1987)).  It concluded that this doctrine permitted suspicionless searches of the probationer's computer, but that to comply with the Fourth Amendment "the monitoring condition must be narrowly tailored, and not sweep so broadly as to draw a wide swath of extraneous material into its net," and "the means employed must bear a 'close and substantial relation' to the government's interest in pursuing the search."  Id. at 190, 192 (quoting Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656, 676 (1989)).  Because there was "very little information in the record about what kind of monitoring the probation condition authorize[d]," id. at 190, the Second Circuit remanded for further consideration of whether the condition was "overbroad" and "whether or not monitoring is sufficiently effective to justify its implementation."  Id. at 193.

Subsequently, in Samson, the Supreme Court upheld a California statute which permitted suspicionless searches of parolees.  Samson, 547 U.S. at 846.  The Court focused on the nature of parole, "release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence."  Id. at 850 (quoting Morrissey v. Brewer, 408 U.S. 471, 477 (1972)).  Because California plainly conditioned parolees' release on his agreement to be searched without a warrant or reasonable suspicion, the Court "conclude[d]

that petitioner did not have an expectation of privacy that society would recognize as legitimate." Id. at 852. The Samson Court explicitly declined to invoke the special need doctrine, reasoning that its "holding under general Fourth Amendment principles renders such an examination unnecessary." Id. at 852 n.3.

After Samson, the Second Circuit has limited its approval of suspicionless searches to parolees, rather than probationers. "Parole is meted out in addition to, not in lieu of, incarceration.... On the Court's continuum of possible punishments, parole is the stronger medicine; ergo, parolees enjoy even less of the average citizen's absolute liberty than do probationers." United States v. Grimes, 225 F.3d 254, 258 (2d Cir. 2000) (quoting United States v. Cardona, 903 F.2d 60, 63 (1st Cir. 1990)). In United States v. Amerson, 483 F.3d 73 (2d Cir. 2007), the Second Circuit noted that the Samson Court had distinguished between the privacy interests of parolees and probationers, and thus concluded that it "must follow Lifshitz and apply the special-needs test to … suspicionless searches of probationers." Id. at 79 (emphasis added).

The necessary implication of the Amerson Court's distinction between parolees and probationers in evaluating the reach of Samson is that searches of parolees are no longer evaluated according to the Lifshitz test. Where the Second Circuit has evaluated parolee search conditions using the special needs doctrine after Amerson, it has always noted that it does so because meeting that standard necessarily means the search at issue "would have also satisfied the lower bar imposed" by the special needs doctrine. United States v. Barner, 666 F.3d 79, 86

27

(2d Cir. 2012) (quoting United States v. Watts, 301 F. App'x 39, 42 n.2 (2d Cir. 2008)).

So too here.  The goals and reasoning laid out in the statutory and regulatory scheme for federal parole and the Parole Commission's March 2, 2016 Notice of Action provide a special need to monitor Pollard's computer activities; as discussed above, the monitoring is reasonably related to the characteristics of Pollard and his crime.  The specific monitoring need is wide-spread; unlike parolees or probationers convicted of possessing child pornography, there are not certain categories of files or programs which require governmental supervision while others could logically be exempt.  Instead, the potential risk could come through any number of communicative methods, programs, or features; notably, Pollard has not suggested how this condition could be limited while still maintaining its purpose and efficacy.

The Court therefore finds that as a special need, and certainly as a clearly communicated condition of parole, the computer monitoring condition does not offend the Fourth Amendment.  See Samson, 547 U.S. at 852; Barner, 666 F.3d at 86.

C.    The GPS Monitoring Condition Does Not Substantially Burden Pollard's Religious Exercise

Pollard's final argument is that the requirement that he wear a GPS monitoring device which must be periodically charged violates RFRA because it burdens his efforts to observe and celebrate the Sabbath and other religious holidays without being the least restrictive means of furthering a compelling governmental interest.  42 U.S.C. § 2000bb-1.  However, this challenge fails, as

Pollard has not carried his initial burden of demonstrating a substantial burden on his religious exercise.  See City of Boerne v. P.F. Flores, 521 U.S. 507, 533 (1997).

The Court accepts Pollard's statement that during the Sabbath, which lasts 25 hours, the tenets of his Jewish faith prohibit him from either inserting a plug into an outlet to charge the batteries that power his location monitor or swapping out those batteries for previously charged ones.  (ECF No. 6 ¶¶ 6-9, 14.)  Certain Jewish holidays, during which the same prohibitions apply, last up to 49 or 73 hours.  (Id.)  And group worship is an integral portion of Pollard's faith.  (Id. ¶¶ 11-12.)

The question posed by a RFRA challenge, however, is whether the GPS monitoring condition "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs."  Jolly v. Coughlin, 76 F.3d 468, 477 (2d Cir. 1996).  There is no indication that it does.  According to the uncontroverted declarations of the Chief United States Probation Officer for this district, the monitoring device Pollard wears can maintain a charge for 80 hours when close to its base station (i.e., when Pollard is at home) and for "well over 24 hours" when away from the base station.  (ECF No. 58 ¶ 10.)  Thus, there is no basis in the record to conclude that the monitor would power down even if Pollard were away from the base charger for the entirety of a 25-hour Sabbath (currently impermissible in light of his curfew restrictions).

Moreover, the history of the eight months Pollard has spent on parole while subject to the GPS monitoring condition further undercuts the argument that this

special condition violates RFRA.  The uncontroverted evidence is that Pollard "has

never reported to the USPO-SDNY that his GPS device has lost its charge during

the Sabbath, or at any other time." (<u>Id.</u> ¶ 12.)  On one occasion Pollard informed the

Probation Office before the start of the Sabbath that his charger was not working,

but "the charge lasted for well over 24 hours and did not run out during the

Sabbath." (<u>Id.</u>)  Simply put, Pollard has not identified any aspect of his religious

exercise which has in fact been hindered or burdened by the charging capabilities of

his location monitor.  Accordingly, "that is the end of the matter." <u>Catholic Health</u>

<u>Care Sys. v. Burwell</u>, 796 F.3d 207, 216 (2d Cir. 2015), <u>vacated</u>, 2016 WL 816249

(U.S. May 23, 2016) (quoting <u>Priests for Life v. United States Dep't of Health &</u>

<u>Human Servs.</u>, 772 F.3d 229, 244 (D.C. Cir. 2014)).

IV.    CONCLUSION

        For the reasons stated above, Pollard's petition is DENIED.  The Clerk of

Court is directed to terminate the motions at docket nos. 1, 11-1, and 36, and to

terminate this matter.


        SO ORDERED.

Dated:       New York, New York
             August 11, 2016

                                        _____
                                            KATHERINE B. FORREST
                                            United States District Judge

30